MARYLAND TELEPHONE UNION, a body corporate of the State of Maryland and a duly certified labor union,

v.

CHESAPEAKE & POTOMAC TELEPHONE CO. OF MD., a body corporate of the State of Maryland and a subsidiary of the American Telephone and Telegraph Co.

Civ. No. 11464.

United States District Court
D. Maryland.
Sept. 1, 1960.

Lewis H. Weiss, College Park, Md., for plaintiff.

Joseph Bernstein, Lawrence F. Rodowsky, and Frank, Bernstein, Gutberlet & Conaway, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is an action by the Union to require the Company to arbitrate a series of grievances which the Company contends are not arbitrable under the limited arbitration provisions contained in the General Agreement between the parties.

The Company is a public utility corporation engaged in an industry affecting commerce. The Union is the recognized collective bargaining representative of the non-supervisory employees (all female) in the Traffic Department offices of the Company. Jurisdiction of this suit is founded on 29 U.S.C.A. § 185.

### Summary of Facts and Issues

The Company customarily grants applications for leave of absence because of pregnancy to women employed in various central offices throughout Maryland, but only half of the women granted such leaves decide to return to work. For many years the Company has followed the policy, embodied in the application form which each applicant for such leave signs, that employment in her former position or otherwise is contingent upon there being a vacancy in a position for which she is qualified. A large majority of those who wish to return are employed promptly in their former positions, but from time to time in various offices outside the City of Baltimore individual women who were full-time employees before their pregnancy leaves are employed part-time upon their return, for periods ranging from a few days to several months, before they are returned to full-time employment. A more detailed statement of the practice is set out in Note 1 below. The Union

1. The practice of using part-time employees originated in 1938 in offices on the Eastern Shore of Maryland. Since this is a produce and resort area, the volume of the telephone traffic is higher in warm-weather months than in the winter. The Company had previously hired and trained temporary employees to handle the peak traffic, and terminated their employment when the volume dropped; so trained employees were lost to the Company when they found year-round employment elsewhere, and new temporary employees had to be trained each year. Part-time employees, working a full work-week during periods of heavy traffic and a part-time schedule during periods of light traffic, provide an available force of trained operators to meet seasonal traffic fluctuations. The Union agreed to this change of policy because it enabled many temporary employees to be reclassi-

objected to this practice, but never succeeded, by collective bargaining, in having it changed. Plaintiff Union filed grievances on behalf of fifteen women

fied as part-time employees and to qualify for various benefits. In years subsequent to 1938 the use of part-time operators was adopted in other out-state offices. There are no part-time operators in Baltimore City.

Over 300 women are granted leaves of absence from the Traffic Department each year. For the last ten years, 90% to 95% of those leaves have been for pregnancy. Pregnancy leaves are usually granted for an initial period of six months, but extensions, usually for additional periods of three months, may be granted.

A pregnancy leave is obtained by written application on a standard form. Since 1949 the form has contained the provision: "If this leave is granted I understand that at the time I wish to return to work, employment in my former position or in any other position with the Company will be contingent upon there being a vacancy in a position for which I am qualified."

The application must be approved by the Benefit Committee, composed of management personnel appointed by the Board of Directors of the Company to administer the Plan for Employees' Pensions, Disability Benefits and Death Benefits. The Benefit Committee indicates whether the period of absence is to be deducted in computing "term of employment" under the Agreement, and whether during the leave of absence the employee shall be eligible for benefits under the Plan. The practice has been to grant pregnancy leaves without eligibility for benefits and to deduct all but the first month of the absence in computing "term of employment".

The names of persons on leave of absence are removed from the "Force Assignment List and Payroll" for the period following the first month of the leave until they are actually reemployed. The word "reemployed" is used as a term of description and is not intended to connote a legal conclusion. During the first month, while the name of the person on leave continues to appear on the list, it is removed in the Central Office with a notation "LA" for leave of absence. A separate list is prepared each week for each Central Office; it lists the name and classification of each employee, and is posted on the wall of the office for the week it is current, as a schedule of hours; it is then used to make up the office payroll showing the hours actually worked. If a person on leave is reemployed, the Central Office notation shows her classification and "Returned from LA". Persons on leave of absence are not included in the monthly remittance of payroll deductions for Union dues (check-off) furnished to the Union by the Company; they are listed on a separate schedule headed "Leaves of Absence".

In practice, the Company has always reemployed with their old status all persons on leaves of absence due to sickness, even if there are no vacancies at the time of their return.

The Company gets in touch with each person on pregnancy leave so that she may select her hours of work and her vacation period if her leave is due to expire either about the time a new schedule is made up for her office or near the vacation season. This is done to honor her seniority in the event she desires to be reemployed and there is a vacancy available for her at the expiration of her leave.

If a person on leave is returned to employment either on a full-time or part-time basis, the employee retains the full seniority she had prior to going on leave, plus credit for the first month of the leave. This seniority is measured for some purposes by "continuous service" (accumulated service since date of last engagement less deduction due to leaves of absence) and for other purposes by "net credited service" (roughly equivalent to Bell System Service). Continuous service is the standard used for priority principally in the selection of working hours and vacation periods. Net credited service is the standard used for layoffs and for benefits under the Plan. A person reemployed after leave on a part-time basis accrues net credited service at the same rate as a full-time employee, but accrues continuous service in accordance with the number of days normally assigned per week, which may or may not be at the same rate as a full-time employee, depending on the schedule.

The Company has documented 164 specific instances, including the present grievances, in which former regular full-time operators were reemployed after a leave of absence on a part-time basis, during the period from 1947 to July 30, 1959; of these 145 occurred during the period 1955–1959.

The conversion of a central office from manual to dial sometimes involves a mass or general layoff under Part II, Article VI of the Agreement. On such occasions

who experienced varying periods of part-time employment upon their return from pregnancy leaves, and now seeks to require the Company to arbitrate those grievances.

The obligation to arbitrate (see Part I, Article IX, Section 1 of the Agreement, infra) is limited for the purposes of this case to grievances which involve "the interpretation or application of the terms of any provision of this agreement not specifically excluded from arbitration".

The Union contends that the existing practice amounts to a general layoff or part-timing under Part II, Article VI, and violates that provision of the Agreement.

The Company denies that contention, and argues: (1) There is no provision in the contract which supports the Union's contention; there is, therefore, no provision to interpret or apply, and the grievance is not arbitrable. (2) A mere claim of arbitrability based on contentions at variance with the settled past practice and construction of the Agreement by the parties does not raise an arbitrable dispute. (3) Fourteen of the fifteen grievances were not timely filed, and are therefore not arbitrable.

The Agreement

"Part I—General" of the Agreement includes "Article VIII—Grievance Procedure" and "Article IX—Arbitration."

Article VIII, Section 1(f) reads as follows: "(f) Method of Settling Grievances: It is agreed that neither the Company, its representatives, nor the Union, its representatives or members, will attempt by means other than the grievance procedure to bring about the settlement of any issue which is properly a subject for disposition through the grievance procedure."

Article VIII, Section 2 provides the "Grievance Meeting Procedure" for grievances "initially presented by the

the Company has, at the request of the Union and in the course of negotiating a plan for the disposition of surplus forces

Union and grievances which were initially presented by employees but in which the Union subsequently elects to participate". It provides for three steps, which were taken in this case. It is not limited to grievances which involve questions with respect to the interpretation or application of the terms of the Agreement.

Article IX, Section 1 reads: "If the parties remain in disagreement at the conclusion of the steps provided in Section 2 of Article VIII (or at the expiration of the time limit provided for the settlement of Company presented grievances in Section 3 of Article VIII), then either party may within two weeks submit the grievance to arbitration upon written notice to the other party, provided the grievance involves:

"(a) the interpretation or application of the terms of any provision of this Agreement not specifically excluded from arbitration; or

"(b) the discharge by the Company of an employee who at the time of discharge had in excess of two years of net credited service; provided, however, that in any such case the decision or action of the Company shall be final unless shown to have been arbitrary or in bad faith, and only the question whether the Company acted arbitrarily or in bad faith shall be subject to arbitration."

Section 2 provides in pertinent part: "(a) Arbitration shall be conducted through a Board of Arbitration consisting of one representative selected by the Union, one representative selected by the Company, and a third member who shall be the impartial chairman."

Part II, Article VI—General Layoffs and Part-timing—reads in part as follows:

"Section 1. Whenever in the judgment of the Company there exists an occasion for the adoption of a program of mass or general layoffs or part-timing (less than a normal work week), or both,

made special agreements on a case by case basis relating to the disposition of persons on leaves of absence.

of regular full-time and regular part-time non-supervisory employees of the Traffic Department of the Company, the Company agrees before proceeding with such program to:

"(a) Lay off all occasional and temporary employees engaged within the job classifications and exchanges affected, in a sequence to be determined by the Company.

"(b) Lay off employees with less than six months net credited service, in a manner to be determined by the Company.

"(c) Notify the Union of its intention to introduce such program and negotiate with the Union in regard to the method or methods to be employed.

"Section 2. The Company shall determine the extent of the reductions required, the effective date or dates thereof, the exchanges, and the job classifications within exchanges to be affected.

"Section 3. If an agreement as to the method or methods to be employed in introducing such program, affecting employees with six months or more of net credited service, is not reached by the Company and the Union within 30 days from the date the Company notifies the Union of its intention to introduce such program, the Union agrees that the Company may then proceed as hereinafter outlined:

"(a) * * *

"(b) The order of layoff within any job classification and exchange selected shall be in the inverse order of seniority. Seniority as used in this Section shall be determined by net credited service.

* * * * * *

"Section 5. If after a period of layoff the Company again desires to hire non-supervisory employees within a job classification and exchange in which there has been a mass or general layoff, the Company agrees to offer reemployment under the conditions hereinafter provided in the Article to former regular employees previously engaged in such job classification and exchange.

"Reemployment shall be offered to former employees in the inverse order in which they were laid off, under the following conditions:

* * * * * *

"Section 6. The provisions of this Article shall not be construed to apply to or prevent the Company at any time from—

"(a) * * *

"(b) Making incidental layoffs or part-timing in any job classification within any exchange on account of the normal fluctuations of the business because of minor readjustments of forces or because of changes in practices, types of equipment or methods of operation. * * * *"

### Collective Bargaining

Since 1947 the non-supervisory employees of the Traffic Department of the defendant have constituted a single bargaining unit. In 1947 the representative of the bargaining unit was Maryland Telephone Traffic Union, Inc. In early 1950 the representative of the bargaining unit was Maryland Traffic Division No. 38 CWA-CIO. Since December 1950 plaintiff has been the representative. Since 1947 the same person has continuously been the president of each of the successive unions representing the bargaining unit and that person has been the chairman of the Union's bargaining team at each contract negotiation.

During collective bargaining in 1947 the Union demanded a job guarantee at the end of pregnancy leaves where the employee had one year of service or more. The demand was not granted.

In 1950 the Union demanded a six months leave of absence for pregnant employees and that "such employees shall be reinstated as employees at the end of such leaves with no loss in seniority except for the period of absence." This demand was discussed at four meetings. A contract was agreed upon which did not include the provision demanded, but CWA-CIO refused to ratify the contract. Thereupon the present Plaintiff Union was formed, an election

was held and Plaintiff Union was certified in December, 1950. After some additional bargaining, principally on the subject of wages, a contract was signed which did not include the provisions demanded.

In 1953 the Union demanded "Termination pay in accordance with Part II, Article VI of present agreement, to be paid upon * * * failure by Company to re-engage at the expiration of leave of absence." Part II, Article VI of the agreement then in force was similar to the same Article of the present Agreement, and provided for termination pay in cases of mass or general lay-offs. This demand was discussed but was not granted.

During collective bargaining in 1954 the Union demanded a "provision guaranteeing no loss of job on termination of a leave of absence", and the Company sought an absolute "no-strike" clause. The Union's demand was discussed at four meetings. On September 24, 1954, the Union presented a revised package proposal, one part of which was as follows: "Withdraw Union Proposal No. 9 providing for guarantee of no loss of job on termination of leave of absence provided Company will withdraw Company Proposal No. 3 providing for a 'no-strike' clause." The two proposals were withdrawn in accordance with this proviso.

During collective bargaining in years since 1954 the Union has made no demand for a clause similar to those demanded in 1947, 1950, 1953 and 1954, and no such clause has been included in any of the agreements.

Prior to the instant dispute, only one arbitration and one earlier grievance had challenged the existing practice.[2]

### The Instant Grievances

(For a full statement of the practice with respect to pregnancy leaves, see Note 1.)

The grievances involved in this action were filed by the Union on behalf of fifteen operators, who were employed in eight separate central offices, all "outstate", i. e. outside the Baltimore metropolitan area. Each such central office is treated as a separate exchange for the purposes of the Agreement. The several leaves of absence for pregnancy were granted, following application therefor by the respective grievants, during the period June 1957 to September 1958. Each grievant was reemployed during the period October 1957 to March 1959. Fourteen of the grievants had been classified as regular full-time operators and one as a regular part-time operator at the times they applied for and were granted their pregnancy leaves. All fifteen were reemployed as regular part-time operators prior to the expiration of their respective leaves. In each case,

**2.** The arbitration involved the following facts: On February 5, 1958, at a time of force surplus, the Company had refused reemployment to all persons on leaves of absence from the "Schedule A Offices", which are treated as one exchange under Part II, Article VI of the General Agreement. That refusal was followed by a layoff of over One Hundred (100) employees, with less than six months service. The arbitrators held that this action constituted a violation of the mass or general layoff clause. The Company's contention that the matter was not arbitrable was overruled by the arbitrators.

The grievance arose in the Frostburg central office in 1953. A temporary operator, junior in seniority, was reclassified to regular part-time shortly before

the time when a former regular full-time operator, senior in service, who was on pregnancy leave, had indicated she desired to be reemployed. The Union contended that the senior employee was entitled to regular part-time reemployment "since it was apparently not necessary to replace her with a regular employee all during her leave of absence, that a vacancy did exist at the time her leave of absence expired and therefore she is entitled to that vacancy". The grievance was resolved by extending the senior operator's leave of absence until the vacation period should start in May, at which time the defendant was to reemploy her part-time. She and the other "part-time regulars" were then to share the part-time work until such time as they would be made "full-time regulars".

at the time the grievant was reemployed, one or more employees who had less seniority than the grievant were employed in the central office involved and were classified as regular full-time employees. At the same time there were also one or more regular part-time employees in each such office.

The grievances were processed through the three stages of the grievance procedure provided for by Part I, Article VIII of the Agreement. In its written Grievance Statement presented to the Company at the third level of the grievance procedure, the Union contended it was aggrieved: " * * * because the Company has violated Part II, Article VI of the Contract. We contend that reclassifying regular full-time employees to regular part-time, is a violation of this provision of the Contract, when it is done out of line of seniority and without prior consultation with the Union."

When the grievances were not resolved to the satisfaction of the Union, it requested that the grievances be submitted to arbitration. The Company declined to participate in arbitration and contended that the grievances were not within the scope of the arbitration clause of the collective bargaining agreement, and were not timely presented.

### Discussion

 The decision of this case is controlled by the principles recently announced by the Supreme Court in United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 1363, 4 L.Ed.2d 1432, and United Steelworkers v. Warrior and Gulf Nav. Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409. See also United Steelworkers v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. "The present federal policy is to promote industrial stabilization through the collective bargaining agreement." 363 U.S. at page 578, 80 S. Ct. at page 1350. "Section 203(d) of the Labor Management Relations Act, 1947, 61 Stat. 154, 29 U.S.C. § 173(d), states, 'Final adjustment by a method

agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *' That policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." 363 U.S. at page 566, 80 S.Ct. at page 1345. However, the Congress "has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." 363 U.S. at pages 582–583, 80 S.Ct. at pages 1345–1346.

 The arbitration clause in the instant case permits either party to submit to arbitration grievances which involve "the interpretation or application of the terms of any provision of this Agreement not specifically excluded from arbitration." The clause is not as broad as the clause contained in many contracts, e. g. the clause in the Warrior & Gulf case. It does not permit a party to require arbitration of any and all disputes. But in the American Mfg. Co. case, the Supreme Court said: "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation

to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator." 363 U.S. at pages 567–568, 80 S.Ct. at page 1346.

In the instant case the Union contends that the existing practice amounts to a general layoff or part-timing under Part II, Article VI, and violates that provision of the Agreement.

The Company argues that there is no provision in the Agreement which supports the Union's contention; that this appears not only from an examination of the Agreement itself, but from the history of the collective bargaining between the parties. However, in the American Mfg. Co. case, the Supreme Court said: "The courts therefore have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware.

"The union claimed in this case that the company had violated a specific provision of the contract. The company took the position that it had not violated that clause. There was, therefore, a dispute between the parties as to 'the meaning, interpretation and application' of the collective bargaining agreement. * * *" 363 U.S. at pages 568–569, 80 S.Ct. at pages 1346–1347.

It cannot be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute.

The Company argues further (1) that the Union's claim is at variance with the settled past practice and construction of the Agreement by the parties, and (2)

that during collective bargaining in 1954 the Union specifically withdrew its demand for such a provision in exchange for the Company's withdrawing its demand for an absolute "no-strike" clause.

■ Under the principles recently announced by the Supreme Court, it seems quite clear that the settled past practice is not a reason for the court to refuse to require arbitration, although it is, of course, an item which should be given consideration by the arbitrators.

The collective bargaining point is more difficult. In the Warrior & Gulf case a majority of the Fifth Circuit said: "Thus, what we have here is a collective bargaining agreement resulting from negotiations between the parties, one of which sought to include a provision prohibiting the company from contracting out some of its work. Having failed at the conference table to obtain the consent of the other party to the inclusion of such provision, it signed the contract that was finally worked out, presumably by a process of 'give and take' between the parties. It is not only consistent with basic principles governing the construction of a contract for the court, as it did, to hold that the final product should not be construed to give the Union the provision it had unsuccessfully sought to have incorporated, but it would be unconscionable for the court to hold to the contrary. * * *" 5 Cir., 1959, 269 F.2d 633, 636–637. Similar rulings have been made by other courts. Local 201, etc. v. General Electric Co., 1 Cir., 1959, 262 F.2d 265, 271–272; Independent Petroleum Workers of America v. Standard Oil Co., 7 Cir., 1960, 275 F.2d 706, 709; Sunnyvale Westinghouse Salaried Emp. Ass'n v. Westinghouse Electric Corp., D.C.W.D. Pa.1959, 175 F.Supp. 685, 690, affirmed per curiam, 3 Cir., 276 F.2d 927. However, the majority of the Supreme Court reversed the Fifth Circuit in Warrior & Gulf without discussing this point. It is hard to believe that the Court means that positions taken and abandoned during collective bargaining can never be

considered by the courts in determining whether a party should be required to arbitrate, especially where a demand is withdrawn as the result of an agreement between the parties. Effective bargaining, as well as good faith, requires that parties live up to their agreements, and that neither party attempt to secure by arbitration what it renounced during negotiations.

■■ Nevertheless, in this case, on the present evidence, and in the present uncertain state of the law. it seems wisest to submit the grievances to the arbitrators, who will consider the history of the collective bargaining along with the other evidence in determining whether the Union's claim is supported by the provisions of the Agreement. As Professor Cox said in Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, at page 1517 (1959), "Since the true nature of a grievance often cannot be determined until there is a full hearing upon the facts, the reasonable course is to send all doubtful cases to arbitration, reserving the right to vacate any award which indisputably goes beyond the scope of the agreement." Of course, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, at page 597, 80 S.Ct. at page 1361.

■ The applications for pregnancy leave, signed by the individual grievants, cannot be used to limit or condition the terms of the collective agreement, J. I. Case Co. v. National Labor Relations Board, 1944, 321 U.S. 332, 337, 64 S.Ct. 576, 88 L.Ed. 762, and therefore cannot bar arbitration in this case, but they may be considered by the arbitrators, along with the other evidence, in determining the existing practice and the nature and extent of the acquiescence therein.

■ The Company notes that fourteen of the fifteen grievances were not filed within the time limits set forth in Part I, Article VIII, Section 1(c) of the Agreement. The one grievance which is admittedly timely is sufficient to raise the basic issues in this case. With respect to the others, there are involved questions of waiver and whether the grievance is based upon a single occurrence or a continuing course of conduct. These matters should be considered by the arbitrators.

Conclusion

I will enter a decree requiring arbitration of the grievances.