COMMUNICATIONS WORKERS OF AMERICA, an unincorporated association, Appellant,

v.

PACIFIC NORTHWEST BELL TELEPHONE COMPANY, a Washington corporation, Appellee.

No. 19246.

United States Court of Appeals Ninth Circuit.

Sept. 28, 1964.

Rehearing Denied Oct. 30, 1964.

Duane W. Anderson, San Francisco, Cal., for appellant.

Donald W. Morrison, James P. Rogers, Charles J. McMurchie, Rockwood, Davies, Biggs, Strayer & Stoel, Portland, Or., for appellee.

Before ORR, MERRILL and BROWNING, Circuit Judges.

MERRILL, Circuit Judge.

This case is before us for the second time. Appellee seeks a declaration that it has no obligation under the terms of its collective bargaining agreement to submit to arbitration a specific dispute between the parties. On the first trial of the case the District Court held that the dispute was one which the parties were, under their agreement, required to arbitrate. Pacific Tel. & Tel. Co. v. Communications Workers of America (D.C. Or.1961) 199 F.Supp. 689. In so ruling it excluded bargaining history from evidence. We held this to be error for the reason that the tendered evidence went not to the merits of the underlying dispute but to the judicial issue of arbitrability and thus did not result in a judicial usurpation of the arbitrator's function. Pacific Northwest Bell Tel. Co. v. Communications Workers of America (9 Cir. 1962) 310 F.2d 244. We remanded for a new trial.

Following a new trial the District Court has concluded:

"The collective bargaining contract between plaintiff and defendant, construed in the light of bargaining history between the parties and the interpretations placed on the contract by the parties, does not obligate the plaintiff to submit to arbitration the disciplinary suspension of Douglas Johnson or the disciplinary suspension of any other contract-covered employee in the Oregon area."

This determination is amply supported by the findings.[1]

1. The Court found in part as follows (with the Court's citations to the record excluded):

"10. During the 1949-50 bargaining negotiations leading up to the execution of the Memorandum of Agreement and Contract of June 1, 1950 which became the 1950 Contract, plaintiff and defendant, through their authorized spokesmen, bargained at length over the question of whether and to what extent unresolved grievances were to be subject to arbitration. Initially, on November 10, 1949, defendant proposed a provision entitled 'Article VI, Grievance and Arbitration,' which subjected all possible disputes to the grievance procedure and provided that any grievance unresolved at the top management level could be referred to arbitration. On November 21, 1949, plaintiff offered its initial proposal, 'Article 5, Grievance Procedure,' which contained no definition of a grievance, provided for the presentation of grievances to successive levels of management up to and including the general department head, but which contained no provision for arbitration whatsoever.

"11. On February 10, 1950, plaintiff proposed a provision entitled 'Article 5, Grievance Procedure,' which contained a procedure for the presentation of grievances similar to its earlier grievance procedure proposal, and also contained a provision for arbitration which read, in part, as follows:

"'Sec. 5.08. If the grievance has been handled in accordance with the provisions of Section 5.01 and 5.02 and has not been satisfactorily adjusted, either party within thirty days after the grievance has been referred for settlement to the general department head, may request that the grievance be arbitrated subject to the following conditions:

"'(a) The provisions for arbitration shall apply only to controversies between the Union and the Company regarding the true intent and meaning of any provision of this contract, or regarding a claim that either party has not fulfilled a commitment made in this contract.'

"This proposal, subsection (a) of which is identical to Section 13.01(a) of Agreed Exhibit 1, was rejected by the defendant for the agreed reason that it covered only those grievances arising out of the interpretation of the contract and not most real grievances which arise from conditions outside the contract and which, under the plaintiff's proposal, would never get to arbitration. Defendant continued to insist upon 'wide open' arbitration of every dispute as provided in their initial proposal of November 10, 1949, Agreed Exhibit 6, and plaintiff rejected any further extension of the matters subject to arbitration.

"12. On March 7, 1950, defendant asked plaintiff if it would accept the union's proposal on arbitration of

grievances, Agreed Exhibit 6, if it were modified to provide for the arbitration not only of the intent of the contract but also discipline and discharges. Plaintiff refused to accept any provision for the arbitration of grievances arising outside the intent or interpretation of the contract such as discipline, work performance and other items of that character.

"13. Thereafter, and particularly on March 8 and 21, 1950, the parties continued to bargain over the question of the arbitrability of discipline, other similar matters and discharges. Plaintiff indicates a willingness to consider limited arbitration of certain discharges of employees with advanced seniority but refused to consider arbitration of any disciplinary action short of discharge. Defendant continued to insist that the contract should provide for the arbitration of both discipline and discharges.

"14. On March 22, 1950, following a caucus with the conciliators, plaintiff offered to include in arbitration, under certain conditions, discharges of employees with more than five years' service. Defendant rejected this offer for the agreed reason that plaintiff had offered no provision for the arbitration of disciplinary cases. Again on March 28, 1950, and May 8, 1950, defendant reiterated its position that the contract should provide for arbitration of discipline and other matters involving management judgment in addition to dismissals.

"15. In May, 1950, defendant offered a proposal containing an article on dismissals and an article on grievance and arbitration. The dismissal article which provided for the arbitration of all dismissals was not accepted. However, the parties did agree to accept that portion of the grievance and arbitration proposal relating to arbitration which was identical to plaintiff's original arbitration proposal and which defendant had rejected as not permitting the arbitration of disciplinary matters.

"16. When the parties executed the Memorandum of Agreement and Contract of June 1, 1950 which became the 1950 Contract, except for the addition of another step in the grievance procedure and minor changes in the provisions for payment of employees and union representatives during the processing of grievances, they agreed to the exact grievance procedure proposed by plaintiff on February 10, 1950. They also agreed upon an arbitration provision identical to the plaintiff's earlier proposal which both parties had agreed would not permit the arbitration of disciplinary suspensions. In addition, the parties agreed upon a proposal for the arbitration of dismissals of employees with over five years' service which the defendant had rejected on March 22, 1950, for the agreed reason that it made no provision for the arbitration of disciplinary cases.

"17. When the parties executed the Memorandum of Agreement and Contract of June 1, 1950 they had agreed that the subject matter of disciplinary suspensions was excluded from arbitration.

"18. Except that the grievance and arbitration provisions were originally both contained in one article and are now found in separate articles, the grievance and arbitration provisions of the 1960 contract are, insofar as pertinent, identical to the provisions so negotiated in 1950.

"19. Except for the fact that the parties in the 1951 contract added an introductory clause and reduced to two the number of years of net credited service required of an employee for his dismissal to be subject to arbitration, the dismissal provision of the 1960 contract is identical to the dismissal provision agreed upon in 1950.

"20. In 1951 and 1952 collective bargaining, defendant offered new grievance and arbitration clauses and new 'dismissal' clauses providing for the arbitration of any and all disputes, which would have included disciplinary suspensions. In 1953 collective bargaining, defendant proposed an article entitled 'Discharges and Demotions' which specifically provided for the arbitration of suspensions. Despite these proposals, the parties agreed to include in these contracts essentially the exact provisions agreed upon in 1950 on these subjects, and no more.

"21. Since 1953 collective bargaining, defendant and plaintiff have not bargained over the subject of the arbitration of disciplinary suspensions.

"22. During the period from 1953 to February 4, 1960, plaintiff suspended a total of 29 employees in the Oregon area on 19 different occasions. All

Appellant's principal contention upon this appeal is that we should, in the light of recent decisions from other circuits,[2] re-examine our earlier decision requiring the District Court to admit the evidence of bargaining history.

In the light of these recent holdings appellant contends that since the parties' agreement respecting the arbitrability of this particular dispute could only be ascertained by an examination of bargaining history, the ascertainment should have been for the arbitrator and not for the courts. Appellant contends

for a rule that judicial determination upon the issue of arbitrability may only be had where the answer is disclosed by the express language of the agreement itself or by some collateral writing. If resort to parol evidence is necessary in order to reach the truth, asserts appellant, then the issue must go to arbitration. Appellant does not now rest its contention on the parol evidence rule (as it did on the earlier appeal), but contends for a special rule applicable to collective bargaining agreements.

Such a rule would indeed be a most workable rule of thumb for the courts in

but one of these employees were suspended for disciplinary reasons.

"23. In the Rutherford case, defendant withdrew its request for arbitration, without prejudice. In the Tallstrom case, defendant processed the grievance up to and including the Vice President and General Manager as a dispute over the unjustified suspension of Helmer Tallstrom. On November 6, 1959, defendant requested arbitration of the 'dismissal' of Helmer Tallstrom. On December 2, 1959, plaintiff denied the request for arbitration on the ground that Mr. Tallstrom had been suspended and not dismissed and accordingly the dispute was not arbitrable. Defendant did not respond to plaintiffs' letter of December 2, 1959.

"24. Bargaining on the 1960–61 contract began on July 25, 1960. During the 1960–61 bargaining, defendant raised no question about the arbitrability of disciplinary suspensions and did not question plaintiff's position as expressed in the letter of December 2, 1959.

"25. The history of collective bargaining negotiations between plaintiff and defendant leading up to and surrounding the execution of the Agreed Exhibit 1 contract and the interpretations placed on the arbitration provisions of that contract and the identical provisions of previous contracts by both of the parties from 1950 through November 11, 1960, discloses that the parties not only did not agree to arbitrate disciplinary suspensions but specifically agreed that such suspensions were excluded from the arbitration provisions of the contract.

"CONCLUSIONS OF LAW

"1. The collective bargaining contract between plaintiff and defend-

ant, construed in the light of bargaining history between the parties and the interpretations placed on the contract by the parties, does not obligate the plaintiff to submit to arbitration the disciplinary suspension of Douglas Johnson or the disciplinary suspension of any other contract-covered employee in the Oregon area."

2. The decisions relied upon have held bargaining history inadmissible on the authority of United Steelworkers v. Warrior & Gulf Nav. Co. (1960) 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; International Union of Electrical, Radio and Machine Workers, AFL-CIO v. General Electric Co. (2 Cir. 1964) 332 F.2d 485; N. L. R. B. v. Gulf Atl. Warehouse Co. (5 Cir. 1961) 291 F.2d 475; Association of Westinghouse Salaried Employees v. Westinghouse Co. (3 Cir. 1960) 283 F. 2d 93; International Union of Electrical, Radio and Machine Workers, AFL-CIO v. Westinghouse Co. (S.D.N.Y.1964) 228 F. Supp. 922; Newspaper Guild v. Hammond Publishing Co. (N.D.Ind.1961) 48 L.R.R.M. 2577. Contra, Independent Soap Workers of Sacramento v. Procter & Gamble (9 Cir. 1963) 314 F.2d 38, cert. denied (1963) 374 U.S. 807, 83 S. Ct. 1696, 10 L.Ed.2d 1031; Independent Petroleum Workers v. American Oil Co. (7 Cir. 1963) 324 F.2d 903, cert. granted (1964) 377 U.S. 930, 84 S.Ct. 1336, 12 L.Ed.2d 294; International Union, United Automobile, A. & A. I. W. v. Cardwell Mfg. Co. (10 Cir. 1962) 304 F.2d 801; United Electrical, Radio and Machine Workers of America (UE) v. General Electric Co. (S.D.N.Y.1962) 208 F.Supp. 870; Maryland Tel. Union v. Chesapeake & Potomac Tel. Co. (D.Md. 1960) 187 F.Supp. 101.

this difficult area; and it may well be that the policy in favor of arbitration would support a requirement that the parties, having agreed to arbitration in certain areas should, in their agreement, expressly set forth any exclusions or exceptions. See for example the District Court's discussion in International Union of Electrical, Radio and Machine Workers, AFL-CIO v. Westinghouse (S.D.N.Y.1964) 228 F.Supp. 922, citing these factors as justification for excluding bargaining history.

Our difficulty is that we cannot square such a rule with what the Supreme Court has held was the judicial function.

The Court has not attempted to impose arbitration on an unwilling party. In United Steelworkers v. Warrior & Gulf Nav. Co. (1960) 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 it expressly recognizes that the duty to submit to arbitration is a matter of agreement and that its ascertainment is for the courts and not the arbitrator. Accord, Atkinson v. Sinclair Refining Co. (1962) 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462. The very nature of a collective bargaining agreement requires that it be read in the light of bargaining history [3] and the history of the parties' own interpretations.[4] A new technical rule of evidence which would render incompetent parol evidence of a party's intent would seem peculiarly inappropriate in the area of collective bargaining.[5]

What the Court has said, as we quoted in our earlier opinion at 310 F.2d 249, is that:

"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail * * *." United Steel Workers v. Warrior & Gulf Nav. Co., supra, 363 U.S. at 584–585, 80 S.Ct. at 1354.

But this recognizes that if evidence of intent is of the "most forceful" character, it need not be confined to the language of the contract; and it would appear clear that the decision whether such evidence dehors the agreement is of sufficient forcefulness is for the courts and not for the arbitrator. The Court, then, has not announced a rule of evidence; it has simply warned that the persuasive power of the evidence must be such that the truth emerges with forceful clarity. We apprehend, however, that it is still for the courts to search out the truth upon this issue.

█ Further it would appear to us to be the law that if the evidence before the Court of purpose to exclude a particular claim from arbitration is not sufficiently forceful, the result is not, as appellant suggests, that the arbitrator must search for the truth at greater depth. The result, rather, is that the answer has been found and that the underlying dispute is arbitrable. If the true intent of the parties is to remain our concern, therefore, it would seem important that we be not required to close our eyes to all but the uncertain writing itself.

We feel that our conclusion in this respect is reinforced by language of the Court in J. Wiley & Sons v. Livingston (1964) 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898. There the Court, while

3. Cf., "Words in a collective bargaining agreement, rightly viewed by the Court to be the charter instrument of a system of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion." United Steelworkers v. American Mfg. Co. (1959) 363 U.S. 564, 570, 80 S.Ct. 1343, 1364, 4 L.Ed.2d 1403 (Brennan, J., concurring).

4. In Drake Bakeries v. Bakery Workers (1962) 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474, the Court considered evidence of management's prior interpretations of an arbitration clause in determining the scope to be given it in a later dispute.

5. "Collective agreements * * * are less complete and more loosely drawn than many other contracts; therefore there is much more to be supplied from the context in which they were negotiated." Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1500 (1959).

affirming the Court of Appeals for the Second Circuit in requiring resort to arbitration of the underlying grievances, disagreed with its holding that it was for the arbitrator to decide whether a duty to arbitrate existed. The Court reiterated its position as follows:

"The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so *a fortiori*, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all." 376 U.S. at 547, 84 S.Ct. at 913.

Accordingly we adhere to our earlier decision that it was error for the District Court to fail to give consideration to evidence of bargaining history.

■ Appellant asserts that the evidence of bargaining history upon which the findings of the District Court were based was not sufficiently "forceful." We cannot agree.[6]

Judgment affirmed.

6. The record shows substantially no dispute upon the facts as found by the court. Appellant has not specifically challenged any of the findings. In its brief it does refer us to certain testimony (apparently in dispute of findings No. 17 and No. 25) as establishing that "at no time did the union ever enter into an agreement with the company to exclude disciplinary suspensions from arbitration."

The testimony to which the Union refers is that of three witnesses who had participated on its behalf in negotiations with the Company. One had participated as Union spokesman since 1955; one had participated as spokesman in 1951, 1952 and 1953; one had never participated as spokesman, but had, as a member of the bargaining committee, participated to some extent in 1950. He was uncertain as to precise extent of his attendance at bargaining conferences, but it is clear that he was not in from the start.

On the other hand, positive testimony from the Company spokesman which was not directly disputed is that from the outset and before any one of the three Union witnesses had appeared on the scene, spokesmen for both sides had conceded and proceeded with the understanding that the language of the arbitration clause as ultimately adopted excluded Company disciplinary action from arbitration. In this respect the Company witness testified in part:

"Now, in the course of the discussions—and they were protracted on this particular point, because the union very urgently wanted—they put forth very strongly their reasons why they wanted such things as disciplinary suspensions subject to a third party decision. So there were days and days, literally, of discussions with respect to this particular article, with them continuing to reiterate that they had to have something better than that; that they could not arbitrate disciplinary suspensions under the company's proposal."

And, later:

"Well, they wanted all actions of a supervisor with respect to treatment of an employee subject to a third party review. And that can run to a wide range of things: the assignment of a girl to a particular switchboard position or to a particular job; it could run—in addition to suspensions, it could run to demotions, where they would demote somebody from a splicer to a splicer's helper. These are some of the examples that we cited in our discussion of this, and that the union cited in their discussion of it. When we cited them they were cited as examples of what we understood the union was wanting. They cited their cases to illustrate the things that they had in mind that ought to be subject to third party review.

"Q. Those were things that were agreed could be the subject of grievances, were they?

"A. Oh, yes. We had a wide-open grievance procedure. 'Grievance' is undefined in the contract. Anything that an employee is dissatisfied with can be grieved up through the grievance machinery to the Vice-President and General Manager level.

"Q. What you were talking about, then, was that the arbitration machinery proposed by the union was as broad as the grievance machinery?

"A. Right."