**SILVERCUP BAKERS, INC., Plaintiff,**

**v.**

**John STRAUSS, as President, or Robert J. Sullivan, as Secretary-Treasurer of Bakery Drivers Union Local 802, International Brotherhood of Teamsters, Defendant.**

**No. 65-M-882.**

United States District Court
E. D. New York.
Sept. 15, 1965.

Gleason & Miller, New York City, for plaintiff, Julius Miller, New York City, of counsel.

Cohen & Weiss, New York City, for defendant, Samuel J. Cohen, New York City, of counsel.

BARTELS, District Judge.

This is an action by a corporate employer under Section 301(a) of the Labor-Management Relations Act, 1947, 61 Stat. 156, 29 U.S.C.A. § 185(a), to compel arbitration by a Union pursuant to a collective bargaining agreement.

Plaintiff, Silvercup Bakers, Inc. ("Corporation") is engaged in the manufacture of bread, rolls and other baked goods for sale and distribution to various retail outlets and employs throughout its over-all operations approximately 650 employees, including route salesmen. The function of the route salesmen, who are employed on a salary plus commission basis, is to service the retail stores and other outlets on their route by keeping them supplied with bakery products according to need, returning unsold goods, and seeking new outlets for the Corporation's products. Deliveries to customers were originally made by the Corporation's salesmen 6 days a week. In 1951 the employees' work week was reduced to a 5-day week, which necessitated a change in the Corporation's operating procedure. It then became necessary in order to cover 6 operating days, for the Corporation to hire additional drivers who are known in the trade as "swingmen" because they swing from one day to another to make deliveries to customers in substitution for the regular route salesmen on the latter's day off, resulting from a reduction in the work week. The days thus released from the 6-day work week by the substitution of the swingmen, are distributed among the route salesmen on the basis of seniority.

On May 1, 1961, the Corporation entered into a collective bargaining agreement with the defendant-Union covering approximately 350 of its employees, consisting of 260 route salesmen, 55 swingmen, 25 route riders and 10 trailer drivers. Article 3 of this agreement provides:

"The work week for all employees covered by this Agreement shall consist of five (5) days. No employee shall be required or compelled to work the sixth (6th) day except in an emergency. If an employee is called to work on the sixth (6th) day, he shall receive time and one half (1½) of the prevailing Swingman's daily basic rate of pay in addition to his regular weekly salary or salary and commission."

Article 19 of the agreement provides:

"(a) There shall be arbitration for *all disputes* which may arise between the parties hereto, except that the arbitrator shall have no power to alter, amend, revoke or suspend any of the provisions of this Agreement. (Emphasis supplied)

(b) The matter in dispute shall be submitted to an arbitrator who shall be appointed by the New York State Board of Mediation at the request of either party. The decision of such arbitrator shall be final and binding upon the parties hereto.

(c) Arbitration shall commence no later than two (2) weeks after the dispute arises."

Article 24 of the agreement provides:

"The Union and Employer recognize the changes that have occurred in retail food stores, i. e., the rapid disappearance of small individual stores and their replacement at an accelerated rate by the large corporate and cooperative food chains, and accordingly it may be necessary to recognize the appropriateness of considering changes in *delivery, merchan-*

*dising and compensation methods.* (Emphasis supplied)

In view of this, the Employer may at any time request a meeting with the Union, for the purpose of negotiating and mutually agreeing on different commission payments or other methods of compensation or *delivery methods* which may be desirable under such changed conditions. (Emphasis supplied)

In the event of such request the parties will meet promptly for the purposes outlined above.

In the event the parties are unable to agree the dispute *shall not be subject to the Arbitration Procedure of this Agreement."* (Emphasis supplied)

On August 6, 1965, the Corporation sent a letter to the Union notifying it that the Corporation would commence operations effective August 16, 1965, on a 5-day week basis consisting of Monday, Tuesday, Thursday, Friday and Saturday. Such action would probably eliminate most of the swingmen. In reply, the Union by letter dated August 10, 1965, advised the Corporation that its proposed action constituted a violation of the collective bargaining agreement since it proposed a change in the "delivery methods", which change could not be effected except after negotiation and mutual agreement with the Union. The Corporation did not respond to this communication but instead addressed a letter, dated August 16, 1965, to the New York State Mediation Board requesting arbitration of the following:

"Has Silvercup Bakers, Inc., under the terms of the collective bargaining agreement and its management prerogatives the right to service their accounts Mondays, Tuesdays, Thursdays, Fridays and Saturdays or would such operation constitute

a violation of Article 24 of said collective bargaining agreement"

In answer to this letter the Union wrote to the New York State Board of Mediation advising that arbitration may not be had upon this issue because the proposed action was a change in "delivery methods" and that such disputes were specifically excluded from arbitration by Article 24 of the collective bargaining agreement.

■ The Union contends that the elimination of the swingmen as proposed by the Corporation, is a change in "delivery methods" within the scope of Article 24; that at the time the language of that article was inserted in the agreement the subject was discussed by the parties and it was definitely understood by both sides that any such changes including "a change from Swing Operation to Drop Out Day" would have to be negotiated and would not be arbitrable because it would involve the remaking of the agreement and that the history of such discussions is pertinent to the controversy.[1] On the other hand, the Corporation denies that there was any such understanding and argues that the proposed change is not a change in "delivery methods" because the method of distribution and delivery will in all respects remain the same under the proposed 5-day plant operation and that the only change is in the number of delivery days rather than in the method of delivery. Further, it contends that Article 24 refers to a change in "delivery methods" necessitated by the disappearance of sales to the small individual stores and the substitution in their place and stead of sales to large corporate and cooperative food chains and distribution centers which in turn would require the Corporation to make drop deliveries of whole loads of its products to distribution centers. From these centers, the chain stores or the distributors, as the case may be, would in turn make dis-

---

[1.] The Union also argues that this Court does not have jurisdiction of the application under the United States Arbitration Act, 9 U.S.C.A. §§ 1–14. Inasmuch as jurisdiction does not depend on this Act but upon § 301 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 185, this contention is without merit.

tributions to the various stores and retail outlets. Such a change in "delivery methods", the Corporation adds, would also involve a change in methods of compensation which was the type of changes envisioned by Article 24, which it claims is devoid of any reference to a reduction in plant operation from a 6-day to a 5-day week.

## I

■ The collective bargaining agreement in this case is sketchily and loosely drawn, leaving open many questions. In construing such an agreement the Court must keep in mind the rules fashioned by the Supreme Court in the three steel cases [2] for the construction of arbitration provisions in such agreements and also the admonition of the Court that such an agreement "* * * is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." [3] The question of arbitrability of any issue is a question for the Court to decide from the language of the agreement. "Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." [4] As the Supreme Court has observed: "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. * * * In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." [5]

■ Both parties have focused their argument upon the arbitrability of the underlying controversy upon the assumption that if the agreement excludes this issue, there is nothing to submit to the arbitrator. As hereinafter discussed, this is not necessarily true. For the purpose of determining the arbitration issue and without any intention of determining the merits of the substantive questions, it is necessary to explain the Court's conclusion. Article 19 of the agreement covers "all disputes". This is a sweeping statement and signifies a willingness of the parties to submit to arbitration all disagreements which are not otherwise specifically excluded. It cannot be said that the exclusionary clause of the agreement indicates a clear purpose to exclude this particular controversy. Nor can it be said that the arbitration provision is not susceptible of an interpretation which covers the dispute. On the contrary, on its face it would appear that the ordinary meaning of the phrase "delivery methods" would exclude from its ambit the number of days upon which deliveries are to be made by the same method or the number of men who must be employed to make such deliveries. In view of the phraseology of Article 24, it appears to the Court that "delivery methods" refers to a retail method of distribution by route salesmen to a number of retail outlets, as contrasted with deliveries to distribution centers or wholesalers, necessitating a change in the "delivery methods" as well as in the compensation of the salesmen. The critical issue in the case

2. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

3. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. p. 578, 80 S.Ct. p. 1351.

4. Atkinson v. Sinclair Refining Company, 1962, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462.

5. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. pp. 582–585, 80 S.Ct. pp. 1353–1354.

is the right of the Corporation to reduce the number of its employees by the number of its swingmen, which it claims is necessitated by business losses. If the parties did not wish to submit this issue to arbitration, it would have been a comparatively simple matter to include such a dispute in the exclusionary clause. The most that can be claimed is that the exclusionary clause is vague and ambiguous upon this point. In such an event the Court is compelled to rule in favor of arbitration.

The Union, however, asserts that the Court should not reach a conclusion upon this issue without consideration of the bargaining history behind the negotiations leading to the arbitration provisions of the contract. If it is necessary for the Court to employ bargaining history to ascertain the meaning of the arbitration provisions of the contract, then the exclusionary clause is not "clear and unambiguous" and arbitration must necessarily follow. Whatever use bargaining history may have in the decisions of the arbitrator upon the questions referred to him, it has no legitimate place in the decision of this Court in determining what, if anything, should be submitted to arbitration. "In short, while this bargaining history may prove very useful to an arbitrator in examining this grievance to determine whether the company has violated any provision of the contract by its subcontracting of work, it is of no legitimate use to a court in deciding whether to order the company to submit the griev-

ance to an arbitrator." [6] The Union's contention has been made and rejected in other cases. "This argument is a perfectly permissible one to make but it certainly, by the directions which the Supreme Court has given, is one with which the arbitrator must labor and not the judge." [7]

## II

Having decided that arbitration is proper, the next step is to determine what issues should be arbitrated. In its letter to the New York State Mediation Board the Corporation has requested the Board to decide not only the issue of eliminating the swingmen but also the following issue:

"* * * would such operation constitute a violation of Article 24 of said collective bargaining agreement"?

While this is not the most skillful way to phrase the question, it is tantamount to requesting the arbitrator to decide whether the issue is arbitrable. This is a crucial issue and is quite different from the underlying question. The resolution of this jurisdictional dispute depends upon the wording of the arbitration clause. In the conventional arbitration clause the jurisdiction of the arbitrator is generally limited to disputes arising out of "the meaning, interpretation and application" of the provisions of the contract. [8] Such language limits the jurisdiction of the arbitrator to the provisions of the agreement without granting him power to decide whether

6. International U. of Elec., R. & M. Wkrs., etc. v. General Electric Company, 2 Cir. 1964, 332 F.2d 485, 490, cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341.

7. Ass'n of Westinghouse Salaried Employees v. Westinghouse Electric Corporation, 3 Cir. 1960, 283 F.2d 93, 95. See also Local 12298, Dist. 50, United Mine Wkrs. v. Bridgeport Gas Co., 2 Cir. 1964, 328 F.2d 381; International U. of E., R. & M. Wkrs. v. Westinghouse Electric Corporation, S.D.N.Y.1964, 228 F. Supp. 922. But see, contra, Communications Workers v. Pacific Northwest Bell

Tel. Co., 9 Cir. 1964, 337 F.2d 455; Independent Soap Workers v. Proctor & Gamble Mfg. Co., 9 Cir. 1963, 314 F.2d 38, cert. denied, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1031.

8. See e.g., the arbitration clause in United Steelworkers of America v. American Mfg. Co., supra. The conventional agreement also sets forth procedural steps to be taken to process the grievance, which are absent from the present agreement. See the specimen arbitration clauses contained in CCH Labor Law Reporter: Union Contracts-Arbitration ¶57,033.

the issue is arbitrable.[9] In a case involving the conventional arbitration clause the Supreme Court has stated that arbitrability is for the courts to decide and that one who asserts that the power to make such a decision is vested in the arbitrator "must bear the burden of a clear demonstration of that purpose."[10] But the conventional arbitration clause is not involved in this case. Instead Article 19 expressly provides that there "shall be arbitration for all disputes which may arise between the parties hereto". The language is explicit, sweeping and all inclusive. "An undertaking to arbitrate 'any dispute, difference, disagreement, or controversy of any nature or character' is certainly broad enough to cover disputes about the meaning of the arbitration clause; if either party refuses to submit a question of arbitrability to arbitration, there is the breach of promise necessary for judicial relief."[11]

■■ In agreeing to submit to arbitration all disputes without exception, subject to the exclusionary clause which does not limit arbitrable disputes to matters pertaining to the meaning, interpretation and application of the provisions of the agreement, the parties agreed to submit the arbitrability of the particular dispute to the arbitrator. In other words, the Court is convinced that the wording of the agreement evinces a clear demonstration of that purpose. "Both the language and the philosophy of the agreement make it the function of the Board of Arbitration to decide the issue of arbitrability."[12] In deciding such issue the arbitrator may, in his discretion, resort to bargaining history. Being a specialized tribunal for the informal development of the facts, it is not startling for the arbitrator to adopt such procedure.[13] While it is improper for the Court to consider such evidence for the purpose of determining whether the parties promised to submit the question of arbitrability as well as any other questions to the arbitrator, it is not improper for the arbitrator to consider such evidence in determining the question of arbitrability as well as the merits of any underlying issue after the Court has decided that the arbitrator may determine the question of arbitrability or any other issue. "The judiciary sits in these cases to bring into operation an arbitral process which substitutes

9. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra. If the determination of the arbitrability of the underlying issue would necessarily require a determination of the underlying issue itself, then both issues must be submitted to the arbitrator. See A. S. Abell Co. v. Baltimore Typographical Union, 4 Cir. 1964, 338 F.2d 190.

10. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. p. 583, n. 7, 80 S.Ct. p. 1353.

11. Cox, Reflections Upon Labor Arbitration, 72 Harv.L.Rev. 1482, 1508 (1959).

12. A. S. Abell Co. v. Baltimore Typographical Union, supra, 338 F.2d p. 195. See also Smith and Jones, The Supreme Court and Labor Dispute Arbitration: The Emerging Federal Law, 63 Mich.L. Rev. 751 (March 1965).
"Reading the arbitration clause as an undertaking to allow the arbitrator to interpret that clause among others would economize time and effort. The evidence bearing upon questions of arbitrability is often relevant to the merits." Cox, Reflections Upon Labor Arbitration, supra, p. 1509.

13. See A. S. Abell Co. v. Baltimore Typographical Union, supra; International Union, U.A., A., & A.I. Wkrs. v. Cardwell Mfg. Co., 10 Cir. 1962, 304 F.2d 801; Maryland Telephone Union v. Chesapeake & Potomac Tel. Co., D.Md.1960, 187 F. Supp. 101.
While the arbitrator "does not sit to dispense his own brand of industrial justice", United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, 363 U.S. p. 597, 80 S.Ct. p. 1361, he does have a right to determine whether the grievance is included in the obligations, express or implicit in some part or the whole of the labor agreement, after consideration of the language of the agreement and the background under which it was negotiated. Smith and Jones, The Supreme Court and Labor Dispute Arbitration: The Emerging Federal Law, supra, p. 786.

a regime of peaceful settlement for the older regime of industrial conflict." [14]

The Court will enter an order submitting to arbitration the issues in accordance with this opinion. Settle same within five (5) days upon two (2) days' notice.

---

14. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. p. 585, 80 S.Ct. p. 1354.