**Paul JENNINGS, as President of International Union of Electrical, Radio and Machine Workers, AFL–CIO, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant.**

**Application of INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Petitioner,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Respondent.**

**Nos. 66 Civ. 2739, 67 Civ. 25.**

United States District Court
S. D. New York.
March 15, 1968.

Vladeck, Elias, Frankle, Vladeck & Lewis, New York City, for plaintiff-petitioner; Stephen C. Vladeck, Bernard Yaker, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for Westinghouse Electric Corporation; John H. Morse, Melvyn Freeman, Edwin A. Kilburn, New York City, of counsel.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

These are consolidated suits to compel arbitration pursuant to Section 301(a) of the Labor Management Relations Act.[1] The issue raised is whether the defendant-respondent, Westinghouse Electric Corporation (the Company) may be compelled to arbitrate some 65 grievances raised by the plaintiff-petitioner, International Union of Electrical, Radio & Machine Workers, AFL–CIO (the Union).

Westinghouse is a Pennsylvania corporation. The Union is an unincorporated labor association with chartered locals in a number of states. The grievances with which we are concerned here arose at 12 different Westinghouse plants. Following exhaustion of contract grievance procedures, the Company refused the Union's requests for arbitration.

The Union commenced suit in the New York Supreme Court seeking judgment directing Westinghouse to arbitrate 52 of these grievances and the action was removed by the Company to this court. Subsequently the Union commenced a suit in this court to compel arbitration of 13 other grievances which arose under the same agreement. The two suits were consolidated.

The Union has moved for judgment on the pleadings or for summary judgment in the removed suit and for an order to compel arbitration in the action commenced in this court. Westinghouse seeks summary judgment in both cases.

The sole issue before the court is the arbitrability of the disputes.

The guidelines for the federal courts in determining whether a grievance is arbitrable under a collective bargaining agreement were clearly set forth by the Supreme Court in the familiar Steelworkers trilogy. See United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed. 2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L. Ed.2d 1424 (1960).

Given a valid agreement to arbitrate, "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., supra 363 U.S. at 582–583, 80 S.Ct. at 1353.

The parties may agree to exclude a particular grievance from arbitration. But "in the absence of any express provision excluding a particular grievance from arbitration * * * only the most forceful evidence of a purpose to exclude a claim from arbitration can prevail * * *." This is particularly true where "the exclusion clause is vague and

1. Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1964) reads as follows:
 "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

the arbitration clause quite broad." United Steelworkers of America v. Warrior & Gulf Navigation Co., supra at 584–585, 80 S.Ct. at 1354.

These principles carry out congressional policy "in favor of settlement of disputes by the parties through the machinery of arbitration." Id. at 582, 80 S.Ct. at 1353.

In determining arbitrability the courts are not concerned with the merits of the grievance. They "have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." United Steelworkers of America v. American Mfg. Co., supra 363 U.S. at 568, 80 S.Ct. at 1347.

The only question before the court is whether upon application of the trilogy principles to the arbitration agreement before it, the parties can be said to have agreed to submit the particular grievance to arbitration.

These principles have been applied in a wide variety of factual situations. See, e. g., Camden Indus. Co., Inc. v. Carpenters Local 1688, etc., 353 F.2d 178 (1st Cir. 1965); Communications Workers of America v. Bell Tel. Laboratories, Inc., 349 F.2d 398 (3d Cir. 1965); Los Angeles Paper Bag Co. v. Printing Specialties & Paper Products Union, etc., 345 F.2d 757 (9th Cir. 1965); Desert Coca Cola Bottling Co. v. General Sales Drivers etc. Local 14, 335 F.2d 198 (9th Cir. 1964); Communications Workers of America v. New York Tel. Co., 327 F.2d 94 (2d Cir. 1964); Local Union No. 787, IUE v. Collins Radio Co., 317 F.2d 214 (5th Cir. 1963); Carey v. General Electric Co., 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed.2d 179 (1964); Proctor & Gamble Ind. Union etc. v. Proctor & Gamble Mfg. Co., 312 F.2d 181 (2d Cir. 1962), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963); Radio Corp.

of America v. Ass'n of Professional Engineering Personnel, 291 F.2d 105 (3d Cir.), cert. denied, 368 U.S. 898, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961); Order of Repeaterman, etc., Local 1011 v. Bell Telephone Co. of Nevada, 254 F.Supp. 462 (D.Nev.1966); Sidney Wanzer & Sons, Inc. v. Milk Drivers Union, Local 753, etc., 249 F.Supp. 664 (N.D.Ill.1966).

The 1963 collective bargaining agreement between Westinghouse and the Union contains an unusually complex and lengthy section on arbitration.[2] The section begins with a very broad promise to arbitrate:

> "Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Section XIV, and which involves either,
>
> (a) the interpretation or application of a provision of this Agreement, or
>
> (b) a disciplinary penalty (including discharge) * * * which is alleged to have been imposed without just cause,

may be submitted to arbitration upon written request of either the Union or the Company * * *." Section XIV–A(1).

Paragraph 4 then goes on to state what is described as the agreement of the parties "in the consideration and decision of any question involving arbitrability."

First, grievances are divided into two categories—those subject to arbitration as a matter of right and those subject to arbitration only by mutual agreement. Arbitration as a matter of right is covered by Paragraph 6 which begins by stating:

> "(a) Arbitration as a matter of right includes only requests to arbitrate which involve:
>
> i Disciplinary action (including discharge) but with certain exceptions spelled out in this Section;

---

**2.** Only certain portions of the arbitration section will be discussed at this point. However, the entire arbitration section, XIV–A of the National Agreement, is reprinted as Appendix A of this opinion.

ii The claimed violation of a specific provision or provisions of the National Agreement (with the limitations and exceptions set out in this Section);

iii The claimed violation of a provision or provisions of a signed local non-wage supplement entered into in accordance with Section XVIII, Paragraph 2 of this National Agreement."

However, Paragraph 6 goes on to say that a request for arbitration under Section XIV–A is not arbitrable as of right unless it "allege(s) a direct violation of the express purpose of the contractual provision in question, rather than of an indirect or implied purpose." Section XIV–A, 6(b).[3]

Paragraph 7 covers matters which are subject only to voluntary arbitration. Its introductory language states generally that "requests for arbitration which are not subject to arbitration as a matter of right under the provisions of Paragraph 6 * * * are subject only to voluntary arbitration." Paragraph 7 then goes on to list 12 categories of arbitration requests, which "it is specifically agreed * * * shall be subject only to voluntary arbitration, by mutual agreement * * *."

The categories listed in Paragraph 7 are of different kinds. Some of them are expressed in very general terms and refer to neither particular contractual provisions nor to specific subject matter. For example, subdivision (c) of Paragraph 7 covers grievances that "involve claims that an allegedly implied or assumed obligation of this National Agreement has been violated." Other subdivisions of Paragraph 7 refer to grievances which arise under specific sections of the National Agreement. Thus, under 7(d) grievances are subject only to voluntary arbitration if they "involve

claims that Section I [Recognition] or Paragraph 3 of Section IV [Discrimination] of this National Agreement has been violated."[4] Other subdivisions of Paragraph 7 deal with grievances which "would require an arbitrator to consider, rule on or decide" a variety of issues including "the elements of an employe's job assignment," (7(f) (i)), and "the right of management to assign or reassign work or elements of work." (7(f) (iii)).[5] Provisions such as these, while dealing broadly with subjects covered by the National Agreement do not focus upon specific provisions of the National Agreement.[6]

Paragraph 4 also states that in considering any question of arbitrability "This agreement sets out expressly all the restrictions and obligations assumed by the parties, and no implied restrictions or obligations inhere in this agreement or were assumed by the parties in entering into this Agreement." (4(b) (iii)). This paragraph also contains a broad management rights provision, which states in part that grievances challenging "action taken by the Company in the exercise of any such rights" are not arbitrable as of right "except where such challenge is based upon a violation of * * * express limitations (other than those set out in Paragraph 7 * * *)." (4(b) (iv)).

Finally Paragraph 4(b) (v) states that "no matter will be considered arbitrable unless it is found that the parties clearly agreed that the subject involved would be arbitrable in light of the principles of arbitrability set forth in this Section" and that neither court nor arbitrator "may proceed under any presumption that a request to arbitrate is arbitrable."

Thus we have in this collective bargaining agreement an arbitration section, Section XIV–A, containing broad arbitration provisions in Paragraphs 1

---

**3.** Paragraph 6(b) goes on to give examples of matters thus excluded. See Appendix A, infra.

**4.** See also 7(h) and 7(i), Appendix A.

**5.** See also 7(e) and 7(f) (ii).

**6.** Other subdivisions of Paragraph 7 do not fall within any of these categories. See, e. g., 7(b) and 7(l). However, since none of these are involved here they need not be analyzed.

and 6, which deal respectively with general arbitrability and arbitration as of right. These broad provisions are hedged about with a variety of restrictive provisions, some general, some specific and many obscure and confusing. The Company claims that the force of Steelworkers trilogy principles has been attenuated, if not rendered inapplicable, by the intent of the parties expressed in these provisions, and that each of the 65 grievances presented is barred from arbitration by express exclusions or restrictions of the right of arbitrability.

The problem with respect to each of the 65 individual grievances presented here is to determine first whether the grievance presents an arbitrable issue under the broad language of the agreement granting arbitration generally and as of right. Secondly, if the grievance falls within this language the question is then whether any of the other provisions of the arbitration section can be said to have the effect of excluding that grievance from arbitration.

█ In approaching these problems due consideration must be given both to the intent of the parties as expressed in the collective bargaining agreement and the duty of the court to effectuate "the preference of national labor policy for arbitration as a substitute for tests of strength between contending forces."[7]

These questions must be resolved in the light of the trilogy principles applied both to the arbitration section viewed as a whole and to such particular restrictions and exclusions as may affect the arbitrability of the particular grievance.

With these general standards in mind I turn to the arbitrability of the specific grievances involved here.

1. National Appeal Grievances Nos. 7406–I, 7407–I, 7410–I (Springfield, Massachusetts) and 8231–C (Columbus, Ohio).

█ These grievances arising at different plants all present the same basic issue. Three of them, Nos. 7406–I, 7407–I and 7410–I stem from a decrease in the working force in Springfield, Massachusetts. The fourth, 8231–C, involves a request to transfer and an increase in working force at the Columbus, Ohio, plant.

The applicable provisions of the National Agreement are found in Section XII, Senority.

"F. Decrease in Working Force.

\* \* \* \* \* \*

2. It is understood and agreed that in all cases of layoffs due to decreasing forces, accumulated length of ·service will govern, and employes will be permitted to displace other employes only if the employe can perform the duties of the job with only such training as an employe with previous experience on such jobs would require.

\* \* \* \* \* \*

"G. Increase in Working Force—
Transfers and Upgrading.

In all cases of transfers and upgrading to fill open jobs, accumulated length of service will govern if the employe's experience, although not necessarily on the same type of work, indicates that he can do the job. The filling of open jobs from the Inactive Seniority List will follow the provisions contained in local supplements provided the employe can do the job with only such training as an employe with previous experience on such job would require.

\* \* \* \* \* \*

"K. Details and Procedures.

Local supplements will cover the details of the above provisions \* \* \*."

The essence of the Union's claims is that the actions of the Company violated the quoted provisions of the National Agreement and the applicable Springfield and Columbus local supplements covering the details of the provisions respecting decrease and increase in working force under Section XII–K.

7. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

The Company's position is that the dispute is not arbitrable under XIV–A–7(h) because it involves "claims of violation of Paragraphs F. and G. of Section XII, in locations in which a local seniority supplement has not been signed in accordance with Paragraph K. of Section XII."

This position is based on correspondence between the Company and the Union with regard to the Union's request to arbitrate these grievances. The requests to arbitrate mentioned only Section XII–F(2) of the National Agreement. When the Union was asked by the Company whether the request involved a claim of violation of the National Agreement where a local seniority supplement had not been signed in accordance with Section XII, the Union replied that there were signed local supplements, but that it believed that the supplements abridged the National Agreement "in many of its provisions." [8] These grievances involve claimed violations of Section XII–F and G of the National Agreement and in each instance there appears to be no doubt that a local supplement was signed as the Company must have well known.

Since it is perfectly clear that a local supplement has been signed, the key to the resolution of these grievances lies in the meaning of the words "in accordance with Paragraph K of Section XII." Although Section XIV–A–7(h) says nothing about the effect of a claimed inconsistency upon arbitrability, the Company attempts to convert a claim of inconsistency by the Union into a concession that a local supplement has not been signed *in accordance with* XII–K. There is no basis for such a reading.

All the Union has done is to express the view that certain provisions of the local supplements conflict with the National Agreement. Section XIV–A nowhere excludes arbitration on the basis of such a claim. The fact that the Union has made such a claim cannot be said to mean that in fact a local supplement "has not been signed in accordance with Paragraph K. of Section XII."

These grievances are arbitrable.

2. National Appeal Grievance No. 6969–U [9] (Sharon, Pennsylvania).

■ National Grievance No. 6969–U claims that the Company unjustly discharged the grievant from work at the Sharon, Pennsylvania, plant and thereby violated the National Agreement. The Union makes the following statement of the circumstances.

The last day on which the grievant worked was November 15, 1963. After he was absent for seven consecutive working days without reporting his absence, the Company removed him from the active roll, effective November 15, 1963. The Company rejected the Union's request that the employee be returned to the active rolls, a request grounded upon "the extenuating circumstances regarding his unreported absence." [10] The Union contends that the grievance alleges discharge without just cause and is arbitrable as of right under Section XIV–A–(1) and XIV–A–6(a) (i).

Section XIV–A–1 states:

"Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Section XIV, and which involves * *

(b) a disciplinary penalty (including discharge) * * * which is alleged to have been imposed without just cause may be submitted to arbitration."

---

8. See plaintiff's Exhibits "16–A," "16–B," "16–C", in 66 Civ. 2739 and "9–A" in 67 Civ. 25. The correspondence relating to National Grievance No. 8231–C (Exhibit "9–A") differs somewhat from that relating to the other grievances, but the basic positions of the parties are the same in all four instances.

9. This grievance in some of the Company's papers is designated as No. 6969–U and in others as 6959–U.

10. Union Complaint, 66 Civ. 2793. ¶ 14(a) p. 16.

Section XIV–A–6(a) then states:

"Arbitration as a matter of right includes * * * requests to arbitrate which involve:

i Disciplinary action (including-discharge) but with certain exceptions spelled out in this Section * * *." [11]

The Company argues that the grievance does not involve a discharge for cause. It states that plant rules at Sharon provide that unreported absence of more than seven consecutive working days will be considered as a quit without notice, that the grievant was absent without giving the Company the required notice and that he therefore was deemed a "quit without notice." It is the Company's position that since there was no discharge, but rather a quit, the grievance involves the obligation of the Company to rehire a former employee, a matter not dealt with in the collective bargaining agreement and one which is therefore subject only to voluntary arbitration.

A resolution of the issue posed by the Company would, contrary to the teaching of the trilogy, involve a determination by the court of the merits of the parties' competing claims. Section XIV–A–1 and 6(a) (i) provides for the arbitration as of right of grievances involving a claim of discharge without just cause.

■ Here, the Union makes such a claim; the Company denies that there was any disciplinary penalty imposed at all. The Union's claim clearly raises an arbitrable issue, and nothing in either the contract itself or the arbitration clause restricts the availability of arbitration to cases in which it is conceded that a discharge has taken place. There is no definition in either the Sharon Local Supplement or the National Agreement of "discharge" nor is there any reference to plant rules. The effect of a local plant rule on the dispute is for the arbitrator and not for the court. Moreover, whether or not a grievance turns out to be frivolous does not go to the question of its arbitrability. See International Union of Electrical, Radio & Machine Workers, AFL–CIO v. Westinghouse Electric Corp., 228 F.Supp. 922 (S.D.N.Y.1964).

I hold that this grievance is arbitrable as of right.

3. National Appeal Grievances Nos. 7266–I and 7267–I (Cleveland, Ohio).

■ These two grievances arose out of a single set of facts. The Company in December 1964, without a Union representative being present, asked certain employees whether they were interested in working during their vacation period for wages in addition to vacation pay and they did so.

National Grievance No. 7266–I claims that the Company bypassed the Union and dealt with the employees individually in violation of Section I—the recognition provision of the National Agreement. The Company contends that this grievance is excluded from arbitration as of right by Section XIV–A–7(d) which provides that there shall be voluntary arbitration only of requests for arbitration that "involve claims that Section I * * of this National Agreement has been violated." This exclusion is a blanket one, similar to that found in Communications Workers of America v. New York Tel. Co., 327 F.2d 94 (2d Cir. 1964), and it effectively excludes from arbitration a claim based on a violation of Section I. Since Grievance 7266–I, based as it is solely on Section I, is expressly excluded from arbitration by the clear and unambiguous language of Section XIV–A–7 (d) it is not arbitrable as of right.

■ Related grievance 7267–I claims that under Section XI–B(5) and (7) [12] of the National Agreement the Company

11. The exceptions referred to will be found in XIV–A–9 and clearly have no application to this grievance. See Appendix A, infra.

12. "5. The right to vacation with pay shall vest as follows:

a. Each employe who is on the active roll and who has completed at least three

is required to give all employees vacation time and that by granting the employees vacation pay in lieu of vacation time, violated Section XI, Paragraphs B–5 and B–7 of the collective bargaining agreement relating to vacations. The Company contends that this grievance is not arbitrable on the grounds that (1) it does not allege that there has been a direct violation of an express purpose of Subparagraphs B–5 and B–7 of Section XI, and therefore is not arbitrable under XIV–A–6 (b), and (2) it is based at best on an implication which the Union finds in these provisions and therefore is excluded from arbitration by XIV–A–7(c) as a grievance involving a claim that an allegedly implied or assumed obligation of this National Agreement has been violated. Its claim is that Subparagraphs B–5 and B–7 prescribe standards for determining whether an employee is entitled to a vacation, and are not addressed to the question of whether an employee entitled to such vacation may choose to work.

Here the Union's claim goes to the meaning of the term *vacation,* when it is used in the paragraph. Whether or not there has been a violation of these provisions in any instance must depend initially on the definition of this term. The Company, assuming its conclusion—that is, that the terms "vacation" and "vacation pay" are synonymous—contends that the provisions do not deal with the question of whether an employee entitled to a vacation may choose to work and that the grievance concerns the violation of an implied obligation. But this begs the question which is simply what the term "vacation" means. The grievance raising this issue is not within the "implied obligation" exclusionary clause.[13]

I hold that grievance No. 7267–I is subject to arbitration as of right.

4. National Appeal Grievances Nos. 7331–U, 7357–U, 7359–U, 7460–U, 7716–I (East Pittsburgh, Pennsylvania).

■ Each of these five grievances claims violation of Section XI–B–5(a) and 6 of the National Agreement relating to vacations.[14]

> months' continuous employment at the close of business of the calendar year immediately preceding the beginning of the vacation year shall be entitled to that vacation in the vacation year for which he has qualified at such close of business, and
>
> b. Each employe who is on the active roll and who has completed at least three months' continuous employment at the close of business on his last working day immediately preceding the time of starting his vacation shall be entitled to such additional (or initial) vacation for which he has qualified at such close of business."
>
> "7. Hourly Employes
> The Company will grant vacations to hourly rated employes meeting the requirement of three (3) months' continuous employment described in subparagraph 5, above as follows:
> (a) One (1) year of accumulated length of service but less than two (2) years—1 week. * * *"
>
> Subsections (b)–(k) contain the remaining scale of vacations based on length of service. The remaining portion of Section XI–7 deals with the computation of the rate of vacation pay.

13. The provisions upon which the Company here has relied in order to exclude arbitration as of right are inapposite. Therefore it is not necessary for the court, in reaching a decision on this grievance, to determine the circumstances, if any, in which XIV–A–6(b) and 7(c) effectively exclude a grievance from arbitration.

14. "5. The right to vacation with pay shall vest as follows:
(a) Each employe who is on the active roll and who has completed at least three months' continuous employment at the close of business of the calendar year immediately preceding the beginning of the vacation year shall be entitled to that vacation in the vacation year for which he has qualified at such close of business. * * *
 * * *
"6. For vacation purposes only, continuous employment is interrupted only when an employe's name is removed from the active roll, except that in case the removal is the result of disability, such removal does not interrupt continuous employment unless and until the employe's name has been removed from the active roll for one year."

While the grievants were on the disability roll they were given vacation pay for a period during which the disability benefits otherwise payable were suspended. It is claimed that these employees should have received their regular vacations earned in addition to and not in lieu of the sickness and accident benefits they were entitled to for disability.

The Union claims the Company violated the vacation provision of the contract when it required the employees to take their vacations with pay while on disability leave.

The Company contends that these grievances are unrelated to the vacation provisions of the agreement on which the Union relies since they do not question the fact that vacation pay was received by the employees. Moreover, it says the Union's position is "that the Company should be *precluded* from granting such vacation pay while employes are on the disability rolls." [15]

The Company apparently misapprehends the Union's position. The question here is not whether vacation pay was received, as it concededly was, but whether the action of the Company deprived the employees of the vacations to which they were entitled under the vacation provisions of the contract by forcing them to take such time while they were on sick leave.

The vacation provisions which the Union claims were violated must be interpreted by the arbitrator so that the definition of the term "vacation" may be determined.

Thus, the Company's contention that these grievances are excluded from arbitration as of right because they do not "allege a direct violation of the express purpose of the contractual provision in question * * *" (subparagraph 5 (b)) is not well taken.[16]

The Company further urges that what is really involved here is an attempt by the Union to gain benefits under the Company's insurance plan in addition to the vacation pay received. It claims, therefore, that these grievances are excluded from arbitration as of right by Section XIV–A–7(i), which precludes such arbitration if the requests

"(i) Pertain in any way to the establishment, administration, interpretation or application of Insurance, Pension or other Benefit plans in which employes covered by this Agreement are eligible to participate. * *."

In my view this provision does not foreclose arbitration of these grievances as of right. No provision of insurance or other benefit plans has been called to the court's attention which touches on the right to vacations which the employees claim was violated.

The question to be arbitrated is whether the employees were deprived of their vacation rights, not whether they were entitled to disability benefits. Whether or not the employees should have been compelled to use up their vacation period while on disability leave is dependent on the interpretation given by the arbitrator to the vacation provisions of the agreement and does not relate to the Insurance benefits provision. These grievances do not pertain to "the establishment, administration, interpretation or application of Insurance, Pension or other Benefit Plans * * *." Section XIV–A–7(i).

I find no such forceful evidence of exclusion as to bar these grievances from arbitration and I hold they are arbitrable as of right.

5. Grievances Alleging Violation of the Equalization of Overtime Provisions of the National Agreement and the Applicable Local Supplements.

A large number of grievances deal with alleged violation of the equalization of overtime provisions of the National Agreement and the applicable local supplements. These grievances ini-

---

15. Westinghouse Brief at p. 39.

16. See National Appeal Grievance No. 7267–I, supra at p. 317.

tially may be divided into two broad categories:

(a) Those which allege that when work was assigned on an overtime basis to a particular group, the wrong employee within that group was chosen to do the work.

(b) Those which allege that the overtime work in question was made available to the wrong group of employees—that is, to a group other than the one that performed the work when it was assigned on a regular, rather than an overtime, basis.[17]

(a) *Grievances Alleging that Overtime Work was Assigned to the Wrong Employee within the Group: National Appeal Grievances Nos. 7750–C, 7986–C, 7984–C, 7652–C, 8262–C (Columbus, Ohio); 7564–I (Buffalo, New York); 8026–C (Mansfield, Ohio).*

The grievances in this category, arising under different local supplements, all raise the same issue. Each alleges that the Company violated applicable equalization of overtime provisions when it assigned the overtime work to the wrong employee in a particular group.[18]

The Company acknowledges that the grievances allege a violation of the overtime equalization provisions. Its sole contention is that arbitration is barred by Section XIV–A(7) of the National Agreement, which states that

" * * * arbitration requests shall be subject to voluntary arbitration by mutual agreement if they

* * * * * *

"(f) Would require an arbitrator to consider rule on or decide any of the following:

* * * * * *

"iii The right of management to assign or reassign work or elements of work. (See footnote)." [19]

Under the principles of the trilogy and subsequent cases, these seven grievances are arbitrable.

 It is clear that the parties to a collective bargaining agreement may agree to exclude specific matters from arbitration. In several post trilogy cases exclusions have been held to be sufficiently clear and specific to foreclose arbitration of a particular grievance as a matter of law. See, e. g., Communications Workers of America v. New York Telephone Co., 327 F.2d 94 (2d Cir. 1964); Local Union No. 787, IUE v. Collins Radio Co., 317 F.2d 214 (5th Cir. 1963). On the other hand, there is no exclusion where a clause is susceptible of two interpretations, one of which would exclude arbitration, the other of which would not. See, e. g., Desert Coca Cola Bottling Co. v. General Sales Drivers etc. Local 14, 335 F.2d 198 (9th Cir. 1964); Sidney Wanzer & Sons, Inc. v. Milk Drivers Union Local 753, etc., 249 F.Supp. 664 (D.Ill.1966).

The Company attempts to read the phrase "to assign or reassign work or elements of work" as including equalization of overtime and thus to exclude arbitration. Such a reading is not justified under trilogy principles in the light of

---

17. The grievances in the second category will be broken down further into subgroups where necessary in the course of this discussion.

18. Although the local supplements involved in these seven grievances are not identical the differences do not bear upon the issue involved here. Columbus Local Supplement Number 7 (Equalization of Overtime) is representative of the provisions under discussion here. In pertinent part, it states:

"Management shall endeavor to equally divide overtime hours among employes within an occupation and labor grade of the respective group. The foreman or supervisors will be responsible for keeping a record pertaining to overtime in addition to the general attendance records for employes under his supervision. These records are subject to periodic review by the respective steward and foreman."

19. The footnote referred to in this provision of the contract will be found infra at p. 320.

the specific provisions of the local supplements dealing with overtime equalization.

There is no specific provision of the contract that deals with the general subject of work assignments. Significantly, however, overtime work is dealt with quite specifically, both in the National Agreement [20] and the local supplements.[21] Moreover, the clause of the arbitration provision on which the Company relies for exclusion is accompanied by a footnote indicating that the clause does not have the effect claimed by the Company. The footnote to Section XIV–A–7(f) (iii) states:

> "Subsections e, f and g * * * reflect the fact that this National Agreement does not set out specific rates or classifications for jobs, and are designed to confirm the intent of Section VIII—Wages that disputes over individual job classifications, rates of pay, incentive standards (time values), etc., are assigned by the parties to local negotiations, and not to arbitration * * *."

The footnote contains no reference to the general subject of overtime equalization; nor is Section X of the National Agreement, which deals with the subject of overtime, mentioned. The failure to mention either overtime generally or overtime equalization specifically in the footnote is significant. Grievances of this kind arise with some frequency. It would have been quite simple for the Company to state clearly, as it did with grievances under the recognition clause, that grievances arising under the overtime provisions of the agreement were not arbitrable instead of attempting to rely on the ambiguous work assignment exclusion.[22]

The arbitration clause is plainly susceptible of an intrepretation that supports the arbitrability of these grievances. Indeed, the more reasonable interpretation of the clause is that questions of equalization of overtime work as between employees within a group is not excluded from arbitration. There is no evidence of a purpose to the contrary.[23] The grievances admittedly allege a direct violation of equalization of overtime provisions.

I hold that these grievances are arbitrable.

*(b) Grievances Alleging that Overtime Work was Assigned to the Wrong Group, Department, etc.: National Appeal Grievance Nos. 7596–U, 7505–U, 7597–U, 7776–C, 7856–U, 7854–U, 7855–U, 7970–U, 7974–U, 7973–U (Sharon, Pennsylvania); 6827–CN (Fairmont, W. Virginia); 6760–C, 8247–C, 8324–C, 8170–C, 8171–C, 6735–C,*

20. See National Agreement, Section X—Overtime.

21. The local supplements governing the merits of these grievances all deal extensively with the question of equalization of overtime. See, Mansfield Works Local Supplement No. 9 "Division of Regular and Overtime Hours"; Columbus Local Supplement No. 7 "Equalization of Overtime"; Buffalo Local Supplement No. VII "Overtime."

22. The Company itself recognized that grievances alleging the assignment of overtime work to the wrong employee within the group are not within Section XIV–A–7(f) (iii), when it stated in its brief:

> "There is a basic distinction between the right of the Company to assign overtime work to various employees and the obligation of the Company to equalize such overtime within a labor grade, occupation, department, etc. The right to assign work relates to the Company's right to exercise its judgment in determining what job classification, what labor grade employee, what department, etc. should perform the work. *The obligation to equalize overtime, in contrast, arises only after the work has been assigned and relates to which employee in the occupation, labor grade, department to whom work is assigned should actually perform the work.*" Westinghouse Brief at 34–35. (Emphasis added.)

23. The bargaining history offered by the Company, if it has any relevance, is applicable only with respect to the overtime grievances in the second category. See infra at pp. 321–323.

*8248–C (Columbus, Ohio); 7342–U, 8334–U, 8339–U, 8341–U, 8335–U, 8342–U, 8358–U, 8464–U, 8465–U, 8466–U, 8467–U, 8468–U, 8469–U, 8470–U, 8471–U, 8472–U (Muncie, Indiana); 6772–I (Buffalo, New York); 7453–I (Turtle Creek, Pennsylvania).*

The majority of the grievances dealing with overtime work come within this general category. Each basically claims that overtime work which should have been assigned to the group of employees normally performing such work on a regular basis was instead assigned to the wrong group of employees, thus preventing equalization of overtime among the employees in the proper group.[24]

These grievances allege the violation of specific local supplement provisions which deal with equalization of overtime and which were signed pursuant to Section X—Overtime of the National Agreement. They are arbitrable, unless expressly excluded from arbitration.

The Company urges two grounds for exclusion without drawing distinctions among any of the grievances:

(1) That these grievances involve the right of the Company to assign work and as such are excluded from arbitration by Section XIV–A–7(f) (iii).

(2) That they are not really concerned with overtime equalization and therefore are excluded from arbitration by subparagraph 6(b) of XIV–A because they do not allege "a direct violation of the express purpose of the contractual provisions in question, rather than of an indirect or implied purpose * * *," and by subparagraph 7(c) of XIV–A because they involve an "implied or assumed obligation." [25]

*(1) Exclusion on assignment of of work grounds—Section XIV–A–7(f) (iii).*

The first issue in dealing with this group of grievances is whether the clause excluding disputes that would require an arbitrator to consider, rule on or decide " * * * the right of management to assign or reassign work or elements of work" unambiguously excludes from arbitration specific grievances alleging violation of the overtime equalization provisions of local supplements.

The Company contends that this clause is unambiguous and that the assignment of overtime as well as regular work is within its terms.

As already indicated, this interpretation is compelled by neither the structure of the contract nor the exclusionary clause relied on.

There is nothing before me indicating whether any special meaning generally is given to the phrase "assignment of work" in the context of collective bargaining agreements. But there is no reason to suppose that overtime work, treated separately both in the contract and the supplements, and a quite usual subject of grievance, is not in a separate category from assignment of work generally.

As has been pointed out in the previous section, there is nothing in the exclusionary clause relied on or the footnote to that clause which specifically excludes overtime or overtime equalization from arbitration.[26] Section XIV–A–7(f) (iii) does not foreclose arbitration of these grievances.

However, in order to show that the parties intended to exclude arbitration of overtime work assignments, the Company submits by affidavit parol evidence as to bargaining history. This submis-

---

24. National Appeal Grievance Nos. 7515–A and 7916–C will be dealt with in another portion of this opinion, since they claim in addition that other contractual provisions were violated. See infra at pp. 325–326.

25. In discussing the first of the Company's two grounds of objection all of these overtime grievances will be dealt with as a group. When the second ground is dealt with, further subdivision will be required.

26. See supra at p. 320.

sion raises two questions: first, may the *court* *consider* parol evidence; second, if so, what is the effect of the evidence submitted upon the availability of summary judgment?

In United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the contract stated that matters "strictly a function of management" were not subject to arbitration. At issue was the Company's action in subcontracting out bargaining unit work, a subject not expressly covered by the contract itself.

The Supreme Court held that the District Court had erred in admitting evidence of bargaining history to show that the Union had failed to obtain a contract provision limiting the Company's right to sub-contract work. The Court said:

> "Nor is there any showing that the parties *designed the phrase 'strictly a function of management' to encompass any and all forms of contracting out.* In the absence of any express provision excluding a particular grievance from arbitration, we think *only the most forceful evidence of a purpose to exclude the claim from arbitration* can prevail, particularly where, as here, the exclusionary clause is vague and the arbitration clause quite broad." 363 U.S. at 584–585, 80 S.Ct. at 1354 (1960). (Emphasis added.)

The use of bargaining history in suits to compel arbitration has been narrowly circumscribed both by Warrior & Gulf and subsequent decisions in this and other circuits. Bargaining history may not be used insofar as it relates to the merits of the dispute before the court. See Local 12298, District 50, United Mineworkers of America v. Bridgeport Gas Co., 328 F.2d 381 (2d Cir. 1964). However, in Strauss v. Silvercup Bakeries, Inc., 353 F.2d 555 (2d Cir. 1965), the Court of Appeals of this circuit held that under appropriate circumstances parol evidence might be used for a different purpose—to show that the language of an exclusionary clause was understood and intended by the parties to cover the subject matter of a particular grievance. See also Communication Workers of America v. Pacific Northwest Tel. Co., 337 F.2d 455 (9th Cir. 1964). See generally *Lesnick,* "Arbitration as a Limit in the Discretion of Management, Union and the N. L. R. B. The Year's Major Developments," Proceedings of New York University 18th Annual Conference on Labor, pp. 7–30 (1966). In *Strauss* the court held it was error for the district court to refuse to consider bargaining history where the language of the exclusion clause was ambiguous and neither of "two proffered interpretations of an exclusionary clause, one of which would permit arbitration, the other of which would prevent it, is frivolous or unreasonable on its face." 353 F.2d at 558. The case was remanded for trial of the issue of whether the bargaining history relating to the intended scope of the exclusionary provision furnished the required most forceful evidence of a purpose to exclude the particular claim from arbitration. Arbitration could be denied only if the trial court, after examination of the exclusion clause and the bargaining history, could say with positive assurance that the exclusion clause covered the particular grievance.

In the case at bar, as in *Strauss,* the proffered bargaining history bears on the question of arbitrability under the exclusionary clause relied upon by the Company rather than on the merits of the dispute. Thus, parol evidence may be considered solely for the limited purpose of showing the understanding of the parties as to the meaning of the "assignment of work" exclusion.

The bargaining history relied on by the Company is of several kinds. The Company's affidavits refer to leaflets distributed by various locals and letters exchanged with the Union concerning the general subject of work or job assignments. These communications do not deal specifically with the question of overtime or overtime equalization and do not aid in resolving the question of

whether this subject matter was intended to be included within the "assignment of work" exclusion.

The Company also points to a communication from the Sharon, Pennsylvania, local to its members, purporting to describe the effect of the arbitration clause proposed by the Company during the 1963 negotiations. Part of this communication reads as follows:

| "Example | Present Agreement (1960) | Westinghouse Proposal (1963) |
|---|---|---|
| Alleged Violation of overtime procedure | Arbitrate — no right to strike | No arbitration You can strike." |

◆

There is no indication that the leaflet was prepared by anyone authorized to take part in the negotiations or that it represented the views of the negotiators. For all that appears it was merely an expression of the Sharon local as to what might happen and quite without any authoritative basis. It can scarcely be considered as "most forceful evidence" of a purpose by the negotiating parties to exclude from arbitration overtime equalization grievances.

It does appear that as a result of litigation between the Union and the Company concerning arbitrability under the 1960 National Agreement, several grievances which involved overtime equalization issues similar to those raised in the case at bar were held arbitrable. See International Union of Electrical, Radio & Machine Workers v. Westinghouse Electric Corp., 228 F.Supp. 922 (S.D.N.Y.1964). The Company's papers in the prior action characterized these grievances as "work assignment grievances" and according to the affidavits submitted by the Company in the present suit

"During the 1963 national negotiations the company referred specifically to the assignment of work grievances involved in the prior court actions and stated its intention to exclude such cases from arbitration in the future. Thus, the Company's proposed arbitration language which was accepted by the Union, excluded from arbitration grievances which 'would require an arbitrator to consider, rule on or decide' an issue involving 'the right of management to assign or reassign work or elements of work.' (Subparagraph 7(f)(iii) of Section XIV–A of the 1963 National Agreement." [27]

The Union has proffered no evidence to the contrary.

However, I do not find that the evidence in the Company's affidavits is sufficiently clear or specific to constitute the "most forceful evidence" of the intention of the parties to exclude which would be required to support a holding of nonarbitrability and thus justify the granting of the Company's motion for summary judgment.[28]

On the other hand, there is sufficient here to raise a triable issue of fact as to whether such forceful evidence exists and therefore to require denial of the Union's motion for summary judgment on these overtime grievances.

27. Affidavit of Frame for Westinghouse, p. 11.

28. For an example of the kind of detailed bargaining history that enabled a court, after trial, to declare with positive assurance that a matter was excluded from arbitration, see Communication Workers of America v. Pacific Northwest Tel. Co., 337 F.2d 455 (9th Cir. 1964).

Thus the Union's motion for summary judgment must be denied insofar as these grievances are concerned and the Company's motion must likewise be denied unless it has shown some other firm ground for exclusion.

### (2) Exclusion on Express Purpose—Implied Obligation Grounds—Section XIV–A–6(b) and 7(c).

The Company argues as to all of the overtime grievances in the second broad category [29] that the Union does not claim that overtime was not equalized within the group, labor grade, occupation or department to which the work was assigned but only that the work was not assigned to the proper group. The equalization of overtime provisions, says the Company, are concerned solely with the even distribution of overtime within the labor grade or occupation to which the work was assigned. Therefore, the Company concludes that these grievances are unrelated to the express purpose of the overtime equalization provisions and are not arbitrable under Section XIV–A–6(b) requiring allegation of a direct violation of an express rather than indirect or implied purpose of the contractual provision.

There is no merit in this argument. Two of the local supplements' provisions on equalization of overtime expressly provide that overtime is to be divided among the employees who regularly work on the job or who normally perform the work.[30]

The express purpose of these local supplement provisions appears to be both to give the overtime job to the group of employees *who normally do the work* and to equalize the overtime within the group. Any other reading of these clauses is artificial. The language in these local supplements does not support a distinction between the Company's failure to meet a commitment to give overtime work to those employees who normally do the job and its commitment to evenly distribute this work within the appropriate group.

The Company's reliance upon Section XIV–A–7(c) is also without merit. The Union relies on two clearly stated provisions of the local supplements and I see no ground for the Company claim that the obligation is an implied one.

The language of the other local supplements involved in these grievances is somewhat different,[31] but leads to the

---

29. See supra at pp. 320–321.

30. This type of provision is found in the following instances:
 (1) National Appeal Grievance No. 6772–I
 The Buffalo Local Supplement states: "it is the intent of the parties to this agreement that overtime will be divided equally among all those who regularly do the work on the job * * *." Buffalo Local Supp. No. VII, ¶ 5, p. 25.
 (2) National Appeal Grievances Nos. 7342–U, 8334–U, 8339–U, 8341–U, 8335–U, 8342–U, 8358–U, 8464–U, 8465–U, 8466–U, 8467–U, 8468–U, 8469–U, 8470–U, 8471–U, 8472–U.
 The Muncie Local Supplement provides: "Overtime will be distributed as equitably as practicable by work shift for those qualified employes normally performing the work." Muncie Local Supp. No. 8; Section X, Overtime, p. 30.

31. The following local supplement provisions are involved in these grievances

(1) National Appeal Grievance No. 6827–CN:
 Fairmount, West Va. Local Supp. No. 5., ¶ 5.4
 "The company will equalize overtime by shift as far as possible among all employees within the group, department or occupation (whichever is applicable) capable of efficiently doing the work."
(2) National Appeal Grievances Nos. 8247–C, 6760–C, 8324–C, 8170–C, 8171–C, 6735–C, 8248–C:
 Columbus Local Supp.
 "Management shall endeavor to equally divide overtime hours among employees within an occupation and labor grade of the respective group."
(3) National Appeal Grievances Nos. 7596–U, 7597–U, 7505–U, 7776–C, 7856–U, 7854–U, 7855–U, 7970–U, 7974–U, 7973–U:
 Sharon, Pa. Local Supp. No. 7.
 "All overtime shall be equalized by seniority among all employees including group leaders, who have the abil-

same conclusion. These local supplements do not state specifically that the groups which normally do the work are also to do the overtime work. They do, however, require equal distribution of work within a group, labor grade or occupation. The question as to each supplement is the meaning of the term "group" or its equivalent when used in this context and considered in the light of the agreement as a whole and the way in which the various other supplements deal with the problem.

The Union contends that the word "group" as used in all of these various supplements means the group normally doing the work, as is specifically said in some of them. The Company itself makes no distinction between the supplements which state that the group which normally does the work is entitled to the job and those supplements which do not.

If the Union is correct, then the Company has violated these provisions by failing to assign the work to the proper group so that equalization within the group can take place as the supplements require. This is a question of interpretation of express language of the supplements, not of implications to be drawn from the language, as the Company would make it appear. No forceful evidence of purpose to exclude these grievances from arbitration can be found in the express purpose clause of Section XIV–A–6(b), or the implied obligation clause of Section XIV–A–7(c). Nor has any bargaining history been offered to support the Company's position. The Company's position with respect to the effect of 6(b) and 7(c) is untenable.

However, the issue as to the effect of the "assignment of work" exclusion is still open. Since neither the Company nor the Union has shown it is entitled to summary judgment as to the grievances claiming assignment of overtime work to the wrong group of employees, both motions for such relief on these grievances are denied.

6. National Appeal Grievance No. 7916–C (Metuchen, Pennsylvania).

This grievance claims only that the Company used nonbargaining unit supervisory personnel to perform overtime work which should have been done by bargaining unit personnel who normally perform the work.

Insofar as this grievance claims violation of Section I (Recognition) it is excluded from arbitration as of right by Section XIV–A–7(d) for the reasons stated earlier.[32]

Here, however, the Union also claims violation of item 28 of the *Appendix* to the National Agreement. This item in the Appendix defines the bargaining unit at the Metuchen plant. However, Section I(1) (Recognition) states that the bargaining units and locals covered by the recognition provision "are set forth * * * in the Appendix attached hereto and made a part of this agreement." This language makes it clear that the Union's reliance on the definition of unit in the Appendix adds nothing to its claim of arbitrability.

Section XIV–A–7(d) excluding from arbitration as of right requests involving "claims that Section I * * * of [the]

---

ity to do the work as provided below. *Note:* This means that the next opportunity for overtime will be offered to the most senior employee in the occupation and labor grade as outlined herein in accordance with the overtime chart."

(4) National Appeal Grievance No. 7453–I:

Turtle Creek, Pennsylvania Local Supp. 7.

¶ 3. "Where overtime is necessary it will be shared equally where pos-

sible among all employees including group leaders who are meeting or bettering the time standards * * * ."

¶ 4. "In equalizing overtime the group will be the primary unit considered. Where no groups exist, employees working on the same job as covered by a single job specification card will be considered an appropriate unit."

32. See supra, p. 316.

National Agreement has been violated," also bars the arbitration as of right of this grievance, insofar as it alleges violation of the Appendix definition, and of the almost identical recognition provisions of the Television Radio Division Local Supplement No. I (Recognition). Insofar as it alleges assignment of overtime work to the wrong group in violation of Television Radio Division Local Supplement No. X [33] overtime it is covered by my previous ruling denying summary judgment to both parties on grievances in this category.[34]

### 7. National Appeal Grievance No. 7515–I (Buffalo, New York).

The claim here is that the Company failed to grant overtime work to employees in the job classification of L–3 Wiremen during vacation shut-down when work usually performed by these wiremen was needed. Violation is claimed of the Buffalo Local Supplement No. VII—Paragraph 5, by failure to divide overtime work equally among those employees who regularly perform it.

This grievance differs from the other grievances based on failure to give overtime work to the proper group only in that the violation occurred during a vacation shut-down. Apparently for that reason the grievance also makes reference to an alleged violation of Section XII–B–3—Vacations, of the National Agreement which recognizes "that some employees will be requested to work during the vacation shut-down."

The gravamen of this grievance is the failure properly to assign overtime. The reference to Section XII–B–3 merely serves to place the grievance within the ambit of the vacation provisions with such special treatment, if, any, as may result therefrom. There is not a separate grievance based on violation of Section XII–B–3 apart from the overtime grievance but a single grievance predicated on failure properly to assign overtime work albeit during the vacation period.

Thus this grievance in the first instance stands or falls with the other grievances claiming failure to assign overtime work to the proper group. As I have indicated in the previous discussion of this group of grievances neither side is entitled to summary judgment on the papers before me.

Both motions for summary judgment are denied as to this grievance also.

### 8. National Appeal Grievance No. 6495–A (Baltimore, Maryland).

Although this grievance, like those in the preceding section concerns equalization of overtime, it requires separate treatment. This grievance alleges that the Company scheduled overtime work for the wrong employees. However, the Union nowhere relates this claim to a violation of any particular provision of the National Agreement or of a local supplement; rather, it claims that the Company violated a longstanding past practice at its Baltimore plant of distributing overtime equally to employees in the same occupation and labor grade.

The Company's answer to the complaint raises as a defense the failure of the grievance to allege a violation of the provisions of the Agreement or Local Supplements. This defense has merit.

The grievance does not involve under XIV–A–1(a) "the interpretation or application of a provision of this agreement." Nor does it meet the requirements of XIV–A–6(a):

"Arbitration as a matter of right includes only requests to arbitrate which involve:

\* \* \* \* \* \*

ii. The claimed violation of a specific provision or provisions of the National Agreement (with the limi-

---

33. In relevant part, Local Supplement No. X states: "Overtime will be distributed equally within a group wherever possible."

34. See supra, pp. 320–325.

tations and exceptions set out in this agreement):

iii. The claimed violation of a provision or provisions of a signed local non-wage supplement * * *."

■ Where, as here, the arbitration section requires that the request to arbitrate must allege a violation of a specific provision of either the National Agreement or the applicable local supplement, a dispute claiming only that the employer has failed to follow a past practice is not subject to arbitration as a matter of right. See Boeing Co. v. International Union, United Automobile, etc. Workers of America, 231 F. Supp. 930 (E.D.Pa.1964), aff'd 349 F.2d 412 (3d Cir. 1965).

This grievance is not arbitrable as of right.

9. National Appeal Grievance No. 7491–C (Mansfield, Ohio).

■ National Grievance No. 7491–C claims that the Company has violated the National Agreement by its failure to provide extra remuneration for an employee performing the duties of group leader. The grievance filed stated:

"We protest the assignment of group leaders duties to the Paint Preparation operator. This new job title is merely a disguise to insert the group leaders duties and neglect group leaders pay. This directly violates the National Agreement which covers group leaders duties and group leaders remuneration of pay."

The substantive provisions of the National Agreement involved are found in Section VIII–5(a) and 6. The opening paragraph in Section VII—Wages, in the National Agreement declares, "Wages will be paid in accordance with wage schedules effective in the various bargaining units. All wage schedules are negotiated locally." It then states that:

"The following provisions affecting wages are applicable to all units.

* * * * * *

"5. Groups and Group Leaders' Remuneration.

a.(1) A group leader is a non-supervisory employe who is a working member of a group, without disciplinary authority, who works under a minimum of supervision, who regularly leads, instructs, and guides employes in the group.

(2). Group leading is in addition to an employe's regular assigned job, and the deciding factor in the selection will be that the senior employe who has the ability to organize and direct a group will be selected.

b. Hourly

The remuneration for hourly group leaders depends for the most part on the work performed and the size of the group. Additional compensation paid for hourly group leaders is based on schedules negotiated locally."

It is clear that this grievance involves the interpretation and application of an express provision of the collective bargaining agreement. Thus, it is arbitrable unless it has been expressly excluded.

The Company claims that, on several grounds, the grievance has been excluded from mandatory arbitration. Section XIV–A–7 declares that a matter is subject only to voluntary arbitration if it

"(e) Would require an arbitrator to consider, rule on or decide the appropriate hourly salary or incentive rate at which an employee shall be paid, * * *. (See Footnote).

"(f) Would require an arbitrator to consider, rule on or decide any of the following:

i The elements of an employe's job assignment;

ii The level, title or other designation of an employe's job classification;

iii The right of management to assign or reassign work or elements of work. (See Footnote) * * *."

"*Footnote*: Subsections e, f, and g above reflect the fact that this National Agreement does not set out specific rates or classifications for jobs, and are designed to confirm the

intent of Section VIII—Wages that disputes over individual job classifications, rates of pay, incentive standards (time values) etc. are assigned by the parties to local negotiations and not to arbitration * * *."

The Company's reliance on Section XIV–A–7(e) is misplaced. This provision, when read in conjunction with the footnote, the preamble to Section VIII—Wages, and the language of Section VIII–5(b), indicates that the parties intended to foreclose arbitration of the actual wage rates. However, once these rates have been set, as directed, by local negotiation, the arbitrator is not dealing with the question of rates. Rather, he is determining whether the rates as set by local negotiation are being paid as required. Cf. International Union of Electrical, Radio & Machine Workers, AFL-CIO, v. General Electric Co., 278 F.Supp. 991 (S.D.N.Y. Jan. 26, 1968).

Section XIV–A–7(f) does not bar arbitration of this grievance either. It is not clear from the face of the arbitration provision or from the other provisions of the contract whether the designation "group leader" is a species of job classification, so that Section XIV–A–7(f) (ii), excluding arbitration of grievances concerning "The level, title or other designation of an employe's job classification" covers this situation. The footnote referred to in Section XIV–A–7(f) (ii) casts no light upon the subject. Moreover, while, as stated in the footnote, the National Agreement does not deal with job classification, the provision relied on by the Union here deals specifically with group leaders. Moreover, although the wage rates for group leaders are to be negotiated locally, the definition of group leaders is not left to local negotiation but is spelled out in the National Agreement.

The exclusions contained in 7(f) (i) and 7(f) (iii) are no more helpful to the Company. The substantive provisions of VIII defining group leaders and their tasks state that "group leading is in addition to an employe's regular assigned job." As indicated previously,[35] the exclusion of grievances involving the Company's right to assign or reassign work or elements of work is subject to a variety of reasonable interpretations. It is certainly reasonable to conclude that the work adverted to in Section XIV–A–7(f) (iii) is *regular* work only, and in that case the tasks of group leaders would not be covered.

The same difficulties are encountered with respect to Section XIV–A–7(f) (i) which excludes from arbitration grievances involving "the elements of an employe's job assignment."

The last claim made by the Company with respect to National Appeal Grievance 7491–C is that it does not involve a direct violation of the express purpose of Section XIII–(5), and therefore is not subject to arbitration by reason of Section XIV–A–6(a) and (b) and 7(c) of the National Agreement.

The fact that the agreement *defines* group leaders in some detail and then refers to local negotiations only on the question of salary, indicates that if certain work is performed by an employee, he is given corresponding status and in such event is to be paid additional remuneration. We are not concerned here as to whether or not this is the correct interpretation of these provisions. Since it cannot be said with positive assurance that the obligation relied on by the Union is an implied one, the general exclusionary provisions of the contract are insufficient to foreclose the arbitration of this grievance.

This grievance is arbitrable.

10. National Appeal Grievance No. 8011–C (Mansfield, Ohio).

Grievance No. 8011–C claims that the employee, a zone maintenance man, was removed from his job and placed in another at a time when he had the greatest amount of accumulated seniority in his seniority unit. Violations of specific provisions of the National

---

35. See discussion of overtime grievances, pp. 318–325 supra.

Agreement and applicable local supplements are alleged—i. e., Section XII–f of the National Agreement and Mansfield Works Local Supplement No. 17, both of which deal with seniority and with decreases in the work force. The grievance is arbitrable unless excluded by some other provision of the arbitration section.

The Company questions the Union's version of the grievance and asserts it is incomplete. It claims that the "grievant's reassignment was not in any way a result of reduced production, and no employe was laid off as a result of his reassignment." [36] It therefore argues that the grievance challenges its right to direct its work force and is not arbitrable under Section XIV–A–4(b) (iv), the management rights clause.[37]

In addition, the Company contends that the grievance does not relate to a decrease in work force, but involves a simple transfer of an employee and is not arbitrable under Section XIV–A–6(b) because it does not "allege a direct violation of the express purpose of the contractual provision in question, rather than of an indirect or implied purpose * * *."

For the same reason, the Company argues that the grievance is not arbitrable under Section XIV–A–7(c).

The provisions on which the Company relies are not sufficient to effectively exclude arbitration of this grievance which is prima facie arbitrable under Section XIV–A–6(a). In the first place, the phrases "express purpose" and "direct violation" are not self-defining. Although 6(b) in an attempt to clarify

these phrases gives examples of requests to arbitrate that are subject only to voluntary arbitration,[38] these examples are not analogous to the claims made by the Union here. Moreover, in most cases a determination of the applicability of the exclusionary provisions will be, as it is here, inevitably tied to a determination of the merits of the grievance. Under the teaching of the trilogy, provisions having this effect are immediately suspect.[39]

The Company is unable to support its position that the grievance is excluded by these provisions merely by reference to the contract and the grievance as stated. It is forced to resort to extrinsic evidence in its attempt to demonstrate that the grievance involves an implied rather than an express obligation. This extrinsic evidence necessarily goes to the merits. If the facts stated by the Union are not accurate or there are additional facts which show that the grievant is not entitled to relief, these are questions for the arbitrator. The court will not seek explanations of why the Union has framed a grievance in the way that it has. Whether the grievance as stated is frivolous or not in accordance with the facts is not for the court.

If the draftsmen of the contract wished to make provision for an agreed upon statement of grievances, they could have done so. In the absence of such provision, the Company's affidavit, going as it does beyond the face of the grievance presented and of the request to arbitrate, may not be considered by the court.

---

36. Affidavit of Newman for Westinghouse, p. 3.

37. See Section XIV–A, Appendix A, infra.

38. " * * * For example, a request which claims incorrect application of the method of computing overtime pay under the provisions of Section X would be arbitrable as a matter of right, whereas a request which questioned the right of the Company to require the performance of reasonable overtime work, on the claimed ground that Section X contains an implied limitation of that right, would be subject only to voluntary arbitration. A request that Section XII and the appro-

priate local seniority supplement had been violated by the layoff of a senior employe in preference to a junior employe would be arbitrable as a matter of right but a request that sub-contracting of work in the plant while bargaining unit employes are on layoff violated a claimed implied limitation of Section XII and the applicable local seniority supplement would be subject only to voluntary arbitration." (Section XIV–A–6(b).

39. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. at 585, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

I hold that Grievance 8011–C is arbitrable as of right.

### 11. National Appeal Grievance No. 7508–C (Mansfield, Ohio).

 This grievance protests removal of an hourly employee from his job as group leader in the receiving department and claims that this resulted in the transfer of the work content of that job, which was being performed by an hourly employee within the certified bargaining unit, to a salaried employee outside the unit.[40] The Union claims violation of Section I—Recognition, of the National Agreement, Appendix Item 27—Definition of the bargaining unit at the Mansfield, Ohio, works; Section VIII–8(c)—Wages, of the National Agreement, and Mansfield Local Supplement 17(c).

As I have already held, grievances claiming violation of Section I—Recognition, or of the definitions of units in the appendix incorporated in Section I, have been effectively excluded from arbitration.[41]

 However, the claimed violations of Section VIII–C and Mansfield Local Supplement 17–C rest on different considerations unrelated to Section I.

The Union claims that the Company violated Section VIII–C—Wages, by failing to negotiate with the Union with regard to the transfer of this employee. This provision states:

> "The policy concerning temporary assignments of incentive or dayworkers to jobs other than their regular jobs where conditions are other than those covered in paragraph B(1) [temporary assignment of incentive operators to job on which no time value is established] and the payment policy for such cases, will be a matter of local negotiations."

The Company contends that this grievance deals not with a temporary assignment but with a permanent one and therefore urges it is excluded from arbitration as of right by the express purpose (XIV–A–6(b)) and implied obligation (XIV–A–7(c)) clauses of the arbitration section.

Violation is also claimed of Mansfield Local Supplement 17–6 which reads as follows:

> "TRANSFERS BETWEEN HOURLY PAID JOBS AND SALARIED JOB.
>
> "Applications from employes requesting transfers from hourly paid jobs to salaried jobs or from salaried jobs to hourly paid jobs will be given consideration in accordance with regular grievance procedure. Transfers of employes from one bargaining unit to another will be a matter of negotiation. Employes transferred from hourly paid jobs to salaried jobs and employes transferred from salaried jobs to hourly paid jobs will reaccumulate seniority regardless of where working or job classification. In case of a reduction in force an employe may return to his former bargaining unit to such jobs as his seniority will entitle him under the decrease in working force procedure."

The Union statement of the grievance does not specify whether the job the grievant was given upon transfer was an hourly or salaried one. The Company claims that the grievant "was removed from his job in the Receiving Department and was placed in another hourly paid job in the plant."[42] It again urges exclusion under Section XIV–A–6(b) and Section XIV–A–7(c).

The questions which the Company raises with respect to Section VIII–C and

---

40. From the Company's papers it appears that no additional salaried employees were brought in to do the work previously performed by grievant, but rather that the number of people assigned to the job was merely decreased. This had the effect of leaving only salaried employees to do the work. This fact, however, does not affect the court's treatment of the question of the arbitrability of this grievance.

41. See supra, pp. 316–317 and pp. 325–326.

42. Affidavit of James Newman for Westinghouse, p. 3.

Mansfield Supplement violations are questions of fact which go to the merits and are to be decided by the arbitrator. For the reasons stated with regard to Grievance 8011–C,[43] the provisions of Section XIV–A–6(b) and 7(c) are not sufficient to foreclose arbitration as of right of this grievance.

Thus, the claimed violations of Section I and Appendix Item 27, are not subject to arbitration as a matter of right. However, the claimed violations of Section VIII–C and of Mansfield Local Supplement 17–6 are arbitrable and I so hold.

### 12. National Appeal Grievance No. 7801–C (Mansfield, Ohio).

■ This grievance alleges that the employee's request for transfer to a job in Labor Grade 3 was denied; that he was entitled to the transfer by virtue of seniority, and that another employee with lesser seniority was given the job. Violation is claimed of Section XII–G of the National Agreement (Seniority-Transfers and Upgrading), and Mansfield Works Local Supplement Nos. 17 and 20.

The Company's contentions that this grievance is not arbitrable as of right are put forward in the context of its own version of the facts as to the dispute. It claims, inter alia, that the job to which transfer was made was classified as Labor Grade 1; that the grievant at the time was Labor Grade 3 and that he did not wish to have the job as classified but wanted it only if additional duties were attached and it was classified as a Labor Grade 3 position. It is urged that the grievance is expressly excluded under Section XIV–A–7(e) and (f), providing voluntary arbitration only with respect to grievances involving rates of pay and designation of an employee's job classification.[44] The Company also places its usual reliance on the express purpose (Section XIV–6(b)), implied obligation

(XIV–A–7(c)) and Management Rights (XIV–A–4(b) (iv)) clauses.

This is a clear example of a dispute as to the facts which goes to the merits of the grievance and not to arbitrability. As I have previously held with respect to Grievance 8011–C[45] the claims of exclusion under Section XIV–A–6(b), 7(c) and 4(b) (iv) are without merit.

The claim of exclusion because the grievance involves rights of pay and job classification provisions is also without merit. The request for arbitration says nothing about either of these subjects. It claims violations of specific provisions of the National Agreement and local supplement granting seniority rights. These are the issues to be arbitrated. The arbitrator is not required "to consider, rule on or decide" job classification or rates of pay issues.[46]

This grievance is arbitrable as of right.

### 13. National Appeal Grievances Nos. 6712–A, 6713–A and 7514–A (Baltimore, Maryland).

■ These three grievances raise related issues. No. 6712–A claims violation of the National Agreement by permitting bargaining work to be performed by non-bargaining unit personnel in the Model Laboratory adjacent to the Baltimore Electronics Building. No. 7514–A claims a similar violation at the Lansdowne Plant of the Underseas Division. No. 6713–A charges violation of the agreement by refusal to permit Union representatives to investigate the work being performed in the Model Laboratory in connection with No. 6712–A.

Numbers 6712–A and 7514–A claim violation of Section I—Recognition and Appendix, Item 2 (defining unit), and in addition Section VI (Union Shop) and Section XII (Seniority). Number 6713–A claims violation of Section XIV–A–2 and 3 (Settlement of Disputes). As I held earlier Paragraph 7(d) excludes arbitration of grievances based on claims

---

43. See supra, pp. 328–329.

44. See Section XIV–A–7(e) (f), Appendix A, infra.

45. See supra, pp. 328–329.

46. See Section XIV–A–7(e) and (f), Appendix A, infra.

of violation of Section I—Recognition, and of the unit definitions that are incorporated by reference into Section I.[47]

The other claims with respect to grievances 6712–A and 7514–A are formulated only vaguely. The Union simply states generally that these grievances involve the interpretation and application of Sections VI and XII without specifying which portions of these sections are claimed to have been violated.

However, the Union has claimed (as required by Section XIV–A–6(a)) that the Company violated specific provisions of the National Agreement and these two grievances are arbitrable unless they have been effectively excluded from arbitration as a matter of right.

The Company avoids specifics likewise. It merely says that these provisions are in no way involved, and relies upon its standard arguments under Section XIV–A–6(b) (failure to allege violation of express purpose) and 7(c) (claim as to implied or assumed obligation). There is no way to resolve these conflicts on the papers before me.

The question of whether these two grievances are excluded from arbitration involving implied or assumed purposes or obligations cannot be determined without a thorough exploration of the merits. This is for the arbitrator.

I hold that Grievances 6712–A and 7514–A are not arbitrable insofar as they allege violation of Section I—Recognition, and the Appendix but are arbitrable insofar as they claim violations of Section VI (Union Shop) and Section XII (Seniority).

■■■ Grievance No. 6713–A claims that the Company violated Section XIV—Settlement of Disputes, by refusing to allow Union representatives to investigate (in connection with Grievance 5712–A) the work being performed in the model laboratory.

The relevant portion of Section XIV states:

"A. Local Grievance Procedure.

\* \* \* \* \* \*

"2. Local officers and stewards will not conduct any form of union business during working hours except after they have been granted permission to do so as provided below. Before leaving work to conduct union business, the local officer or steward will report to his foreman or supervisor and request permission to leave his job, which will be granted unless his departure would cause serious interference with operations. In such cases the foreman or supervisor will make arrangements for the Local officer or steward to leave his job as promptly as possible.

"3. For the purposes of this Section union business is defined to mean: (a) investigation of a problem concerning rates of pay, wages, hours of employment or other conditions of employment; (b) attendance at a meeting with one or more representatives of Management for handling or adjustment of grievances or for the purpose of collective bargaining; and (c) absence from the plant to conduct union business off Company property."

The merits of the grievance are tied into the issue of arbitrability, since the whole question is whether under the quoted provisions the Union representatives were improperly denied permission by the foreman or supervisor to investigate conditions in the Model Laboratory. Grievances based on Section XIV are not specifically excluded from the arbitration by the arbitration section (XIV–A).

It may be that the facts developed before the arbitrator will not show that permission to investigate was improperly denied. That question, however, goes to the merits and is for the arbitrator. There is no forceful evidence of the exclusion of this subject matter from arbitration as of right.

I hold that Grievance No. 6713–A is arbitrable.

47. See supra, at pp. 316–317 and 325–326.

The respective motions of the parties are disposed of in accordance with the foregoing rulings. Settle order on five (5) days notice so providing.

## APPENDIX A

### SECTION XIV–A—ARBITRATION

1. Any grievance which remains unsettled after having been fully processed pursuant to the provisions of Section XIV, and which involves either,

(a) the interpretation or application of a provision of this Agreement, or

(b) a disciplinary penalty (including discharge) imposed on or after the effective date of this Agreement, which is alleged to have been imposed without just cause, may be submitted to arbitration upon written request of either the Union or the Company, provided such request is made within sixty (60) days after the final decision of the Company has been given to the Union pursuant to Section XIV, Paragraph B.3. For the purpose of proceedings within the scope of (b) above, the standard to be applied by an arbitrator to cases involving disciplinary penalties (including discharge) is that such penalties shall be imposed only for just cause.

2. (a) A request for arbitration shall state in reasonable detail the nature of the dispute and the remedy requested. A copy of the request shall be sent to the American Arbitration Association.

(b) Within thirty (30) days after receipt of a request to arbitrate, the receiving party will give its response thereto in writing, with a copy to the Association, stating whether or not it believes the stated dispute to be arbitrable. If the receiving party believes the dispute not to be arbitrable, it will state its reasons in reasonable detail.

(c) If the response agrees to the arbitrability of the dispute, the Association will proceed to process the request in accordance with Paragraph 3.

(d) If a response to a request for arbitration disagrees as to arbitrability of the dispute, either party may request a conference to discuss the arbitrability of the dispute, and to seek to resolve the differences between the parties.

3. (a) When a request for arbitration involves only relief from a disciplinary penalty or discharge alleged to have been imposed without just cause, or involves a dispute which the Company admits to be arbitrable, or when a final court judgment shall have ordered arbitration of a request, the parties shall attempt to reach mutual agreement on the arbitrator. If the parties fail to reach such mutual agreement on the arbitrator within a fifteen (15) day period, either party may, but only within ten (10) days thereafter, request the American Arbitration Association to submit a list of names from the Association's Panels, from which an arbitrator may be chosen. No arbitrator shall be appointed by the Association who has not been approved by both parties unless and until the parties have had submitted to them three (3) lists of arbitrators from the Association's Panels, and have been unable to select a mutually satisfactory arbitrator therefrom.

In the event the arbitrator requests the parties to supply him with a stenographic record of the arbitration proceeding, the parties shall equally divide the cost of one copy for him. The arbitrator shall have no authority to issue any subpoena or other form of legal process or award to compel either party to produce new evidence (not already presented during processing of the grievance in the grievance procedure) considered by such party to be confidential or not relevant or material to the proceeding, or which is not available. This shall not limit the arbitrator's authority to compel the production of information which this Agreement or a local supplement requires either party to provide the other.

The arbitrator shall have no authority to make any award requiring payment to any employe for any period more than thirty (30) days preceding the filing of a grievance.

(b) Only one request shall be scheduled for the same arbitration hearing,

except by mutual agreement of the parties.

(c) In the selection of an arbitrator and the conduct of an arbitration hearing, the applicable provisions of the Voluntary Labor Arbitration Rules of the Association shall control, except that either party may, if it desires, be represented by counsel.

(d) The dispute as stated in the request for arbitration shall constitute the sole and entire subject matter to be heard by the Arbitrator, unless the parties agree to modify the scope of the hearing.

4. (a) In the event the receiving party has asserted that the dispute contained in a request for arbitration is not arbitrable, the Association shall have authority to process the request for arbitration and appoint an arbitrator in accordance with the procedure set forth in Paragraph 3 above only after a final judgment of a Court has determined that the grievance upon which arbitration has been requested raises arbitrable issues and has directed arbitration of such issues. The foregoing part of this Paragraph shall not be applicable if the request for arbitration involves only relief from a disciplinary penalty or discharge alleged to have been imposed without just cause.

(b) In the consideration and decision of any question involving arbitrability (including any application to a court for an order directing arbitration), it is the specific agreement of the parties that:

i Some types of grievance disputes which may arise during the term of this Agreement shall be subject to arbitration as a matter of right, enforceable in court, at the demand of either party (See Paragraph 6 below).

ii Other types of disputes shall be subject only to voluntary arbitration, i. e., can be arbitrated only if both parties agree in writing, in the case of each dispute, to do so. (See Paragraph 7 below.)

iii This Agreement sets out expressly all the restrictions and obligations assumed by the respective parties, and no implied restrictions or obligations inhere in this Agreement or were assumed by the parties in entering into this Agreement.

iv In the consideration of whether a matter is subject to arbitration as a matter of right, a fundamental principle shall be that the Company retains all its rights to manage the business, including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to direct the work force and to conduct its operations in a safe and effective manner, subject only to the express limitations set forth in this National Agreement and local supplements to this Agreement executed under the provisions of Section XVIII—Modification, Paragraph 2. thereof; and it is understood that the parties have not agreed to arbitrate demands which challenge action taken by the Company in the exercise of any such rights, except where such challenge is based upon a violation of any such express limitations (other than those set out in Paragraph 7 below).

v No matter will be considered arbitrable unless it is found that the parties clearly agreed that the subject involved would be arbitrable in light of the principles of arbitrability set forth in this Section and no court or arbitrator shall or may proceed under any presumption that a request to arbitrate is arbitrable.

(c) If a final judgment of a court has determined that a request raises arbitrable issues, the court's decision shall specify in reasonable detail the issues as to which arbitration is directed. The arbitration shall thereafter proceed only upon the issues specified in such final court judgment and the arbitrator shall have no authority or jurisdiction to consider issues other than those specified.

5. The award of an arbitrator upon any grievance subject to arbitration as herein provided shall be final and binding upon all parties to this Agreement, provided that no arbitrator shall have any authority or jurisdiction to add to, detract from, or in any way alter the provisions of this Agreement.

6. (a) Arbitration as a matter of right includes only requests to arbitrate which involve:

i Disciplinary action (including discharge) but with certain exceptions spelled out in this Section;

ii The claimed violation of a specific provision or provisions of the National Agreement (with the limitations and exceptions set out in this Section);

iii The claimed violation of a provision or provisions of a signed local non-wage supplement entered into in accordance with Section XVIII, Paragraph 2. of this National Agreement.

(b) A request for arbitration, in order to be subject to arbitration as a matter of right under the provisions of subsection (a) (ii) and (a) (iii) above, must allege a direct violation of the express purpose of the contractual provision in question, rather than of an indirect or implied purpose. For example, a request which claims incorrect application of the method of computing overtime pay under the provisions of Section X would be arbitrable as a matter of right, whereas a request which questioned the right of the Company to require the performance of reasonable overtime work, on the claimed ground that Section X contains an implied limitation of that right, would be subject only to voluntary arbitration. A request that Section XII and the appropriate local seniority supplement had been violated by the layoff of a senior employe in preference to a junior employe would be arbitrable as a matter of right but a request that sub-contracting of work in the plant while bargaining unit employes are on layoff violated a claimed implied limitation of Section XII and the applicable local seniority supplement would be subject only to voluntary arbitration.

7. All requests for arbitration which are not subject to arbitration as a matter of right under the provisions of Paragraph 6 above, are subject only to voluntary arbitration. In particular, it is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they

(a) Involve the existence or alleged violation of any agreement other than those described in 6(a) above.

(b) Involve issues which are discussed at national level negotiations, but which are not expressly covered in this National Agreement (e. g., subcontracting).

(c) Involve claims that an allegedly implied or assumed obligation of this National Agreement has been violated.

(d) Involve claims that Section I, or Paragraph 3 of Section IV of this National Agreement has been violated.

(e) Would require an arbitrator to consider, rule on or decide the appropriate hourly, salary or incentive rate at which an employe shall be paid, or the method (day, salary or incentive) by which his pay shall be determined.*

(f) Would require an arbitrator to consider, rule on or decide any of the following:

i The elements of an employe's job assignment;

ii The level, title or other designation of an employe's job classification;

---

* Subsections e, f, and g above reflect the fact that this National Agreement does not set out specific rates or classifications for jobs, and are designed to confirm the intent of Section VIII–Wages that disputes over individual job classifications, rates of pay, incentive standards (time values), etc., are assigned by the parties to local negotiations, and not to arbitration. The special arbitration provisions set forth in Section VIII, Paragraphs 9.D and 9.E shall not be affected by these provisions.

iii The right of management to assign or reassign work or elements of work.*

(g) Would require an arbitrator to determine the method or data to be used by the Company in setting an incentive standard (time value).*

(h) Involve claims of violation of Paragraphs F. and G. of Section XII, in locations in which a local seniority supplement has not been signed in accordance with Paragraph K. of Section XII.

(i) Pertain in any way to the establishment, administration, interpretation or application of Insurance, Pension or other Benefit plans in which employes covered by this Agreement are eligible to participate (subject to the provisions of Section XII, Paragraph A.).

(j) Involve discipline or discharge imposed on employes having less than six months of accumulated length of service with the Company, provided that if by local supplement a period of less than six months has been agreed upon as the probationary period for new employes, and such local supplement is applicable to the particular employe involved, such agreed upon shorter period of time shall be substituted for "six months" in the foregoing; and provided further that nothing in this sub-section shall limit the authority of an arbitrator with respect to disciplinary penalties or discharges imposed in violation of Paragraph 1 of Section IV.

(k) Pertain in any way to the Layoff Income and Benefits Plan or its interpretation or application.

(l) Pertain in any way to the provisions of any local supplement covering a retraining program.

8. In any case which involves discipline (including discharge) effected on the ground that an employe has refused, orally or otherwise, to perform an assigned task, either party may, at any time before the arbitration hearing is closed, request that the arbitrator decide the matter without an opinion, in which event the arbitrator must simply determine and announce an award without stating any grounds or reasons for his decision. If an award is issued by an arbitrator in any such case, it shall be final and binding on the parties, but, to the extent that the arbitrator's opinion in support of his award interprets or applies any provision of this National Agreement, such opinion shall not be considered binding upon the parties, and shall not constitute a precedent for the purpose of interpreting or applying that provision of the Agreement in the future.